BALLY MANUFACTURING CORPORATION, Plaintiff-Appellee, *v.* JS&A GROUP, INC., Defendant-Appellant.

First District (3rd Division)    No. 80-234

Opinion filed August 27, 1980.

George J. Casson, Jr., of Bell, Boyd, Lloyd, Haddad & Burns, of Chicago, for appellant.

Allen J. Fagel, Alvin D. Meyers, Floyd Babbitt, and Paul M. Seeley, all of Chatz, Sugarman, Abrams, Haber & Fagel, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, JS&A Group, Inc., brings this interlocutory appeal from an order granting plaintiff, Bally Manufacturing Corporation, a preliminary injunction restraining JS&A from publishing "false or confusing" advertisements concerning Bally or its products, services or warranties. Bally is engaged in the manufacture and sale of amusement devices such as the "Bally Arcade," a home library computer. The Bally Arcade is a system which permits users of the device to play various games through home video sets. Bally sells this product to distributors and wholesaler-retailers rather than directly to the general public. JS&A is engaged in the business of promoting and selling amusement devices, including the Bally Arcade, through mail orders. It markets its products through a catalog and advertisements.

On December 7, 1979, Bally filed a complaint for injunction alleging that on October 31, 1979, and December 3, 1979, JS&A placed two advertisements in the Wall Street Journal which contained false statements about Bally and its products, services and warranties. Bally charged that the false statements were violative of certain provisions of the Uniform Deceptive Trade Practices Act. (Ill. Rev. Stat. 1979, ch. 121½, par. 312(2), (5), (7), (9) and (12).) Bally claimed irreparable injury and loss, for which it had no adequate remedy at law. Bally sought preliminary and permanent injunctive relief, and requested compensatory and punitive damages.

On December 13, 1979, the trial court issued a temporary restraining order prohibiting JS&A from "publishing or circulating false advertisements regarding plaintiff or its products * * *." Thereafter JS&A filed an answer admitting placing of the two advertisements but denying their falsity or impropriety. The trial court then conducted a hearing upon Bally's request for preliminary injunction at which the following evidence was adduced.

In 1977 JS&A purchased approximately 3,000 Bally Arcades from

Bally for resale to the public. JS&A also purchased cartridges used in the operation of the devices. JS&A returned approximately 1,000 defective units to Bally. Upon receipt, Bally would replace the defective unit. Each unit was accompanied by a warranty card and owner's manual. The warranty listed the address, while the manual contained both the address and telephone number of the Bally Consumer Products Division. The "limited" warranty extended "to the original purchaser only" and provided that the unit would be free from defects in materials and workmanship for 90 days after purchase. After the 90-day period, Bally would replace all defective parts for one year with the customer incurring all labor costs.

Mary Stanke, JS&A's executive vice-president, testified that in October 1979, JS&A had 400 Bally Arcades and 3,256 cartridges in its inventory. Of the 400 devices, 60 were broken and 340 were operational. Some of the units had been returned by customers after a trial period. According to Stanke, she had read the warranty provisions set forth on each card.

On October 26, 1979, Stanke telephoned Joan Mason, a Bally manager, to determine to what extent the warranty would apply to the remaining units in JS&A's inventory. Joseph Sugarman, JS&A's president, also participated in the conversation. Both Stanke and Sugarman testified Mason informed them that all such units were covered by the warranty. Stanke testified that they explained to Mason that the 340 operational units were returned devices. On October 30, 1979, Stanke wrote Mason confirming the telephone conversation. In the letter, Stanke stated that she understood Bally would honor the warranty on the units in JS&A's warehouse, but that it would not repair any of the defective devices until JS&A settled its outstanding account, and that JS&A thus saw no alternative but to "dump" the merchandise on the retail market. Mason wrote back stating that during the telephone conversation, she had informed Sugarman that Bally would service according to the warranty, and that the warranty applied only to the original purchaser and not to any pre-owned or defective merchandise.

Meanwhile, to liquidate its inventory of units and cartridges, JS&A placed an advertisement prepared by Sugarman in certain regional editions of the October 31, 1979, Wall Street Journal. The advertisement offered to sell the inventory of Bally Arcades for $49.95 per unit and continued:

> "We are liquidating our entire inventory of Bally Arcade programmable TV games * * *. Some units have slight scratches but all are fully operational. Some are new units, some were returned by customers during our 30-day trial period. Product comes with one-year limited warranty backed by Bally Corporation and four pistol grips. * * * You may also select from four cartridges regularly $20 to $25 each—but offered here at half price. * * * There are many

other cartridges offered by Bally and we will supply you with Bally's address for future orders."

Sugarman testified that after publication of this advertisement, Bally's counsel complained that the advertisement contained two errors: that the warranty did not cover all of the units offered for sale and that customers could not order cartridges directly from Bally. Bally requested a retraction. Sugarman stated that he was familiar with the warranty's terms, but that based on previous experience, he did not realize it extended only to the original purchaser. He was also aware that Bally did not sell its product directly to the general public. Yet, for a year, JS&A had, with Bally's knowledge, supplied Bally's address to customers who wished to order cartridges. Sugarman agreed that the portion of the advertisement concerning the availability of cartridges from Bally could be misleading. He testified, however, that the message intended to be conveyed was that customers could obtain from Bally the name of a dealer from whom cartridges could be purchased. JS&A did not believe that the advertisement contained errors, but printed a retraction in order to avoid future problems.

Stuart Goldblatt, director of special projects at JS&A, testified that in November 1979, at Stanke's direction, he contacted Bally to ascertain its policy toward out-of-warranty merchandise. When he telephoned asking to speak to a Bally service manager, he was referred to a Mr. Schultz. Goldblatt identified himself as a consumer who owned a Bally unit which was not working properly. Schultz informed him that Bally would repair units not under warranty for $25 and tag on a 90-day limited warranty from the date of repair. Goldblatt did not identify himself as an employee of JS&A nor his purpose in seeking the information. He did not later verify the information received from Schultz.

Based on the information received by Goldblatt, Sugarman prepared an advertisement entitled "Retraction" which appeared on December 3, 1979, in the same regional editions of the Wall Street Journal as before. It read, in relevant part, as follows:

### "FIRST ERROR

The first error in our ad was our mentioning that 'We will supply you with Bally's address for future orders.' What we should have said was that 'Bally can give callers the names of its dealers who will have the additional cartridges that are not available from JS&A.' We trust this clarifies that situation.

### SECOND ERROR

The second error concerned the warranty. We mentioned that the unit 'comes with a one year limited warranty backed by Bally

Corporation and four pistol grips.' Obviously, the unit was not backed by four pistol grips but rather 'came with four pistol grips.' And secondly, Bally's lawyers told us that the warranty applied only to the original purchaser.

This meant that the units we had in stock, despite their excellent condition, had no warranty since they were returned units and that all Bally would do is service them at a cost of $25 if they ever needed service.

## THIRD ERROR

If that wasn't bad enough, although the advertisement also mentioned that units were returned 'during our 30-day trial period,' there were units that were returned even beyond that period due to our lenient return policies. So even that was misstated.

So here we were with a dilemma. With the FTC watching our every move and Bally Corporation's lawyers wanting us to print a retraction, we simply returned all our customers' checks and shipped our entire inventory of working Bally units, free of charge, to many of the customers who ordered the unit and all four cartridges.

\* \* \*

## 60 DEFECTIVE UNITS

But we had another dilemma. We had 60 units that were defective-product [*sic*] we couldn't repair and that Bally refused to repair under warranty.

\* \* \*

We'll offer our 60 Bally units for two cents each. Each unit looks like new, but when you plug one in, nothing happens. The units are not backed by Bally Corporation nor are they backed by four pistol grips. But they are cheap.

If you do receive a unit, you can send it to Bally and for $25, they'll repair it for you and tag on a 90-day limited warranty on their repair job."

Richard Schultz, Bally's product and sales trainer, testified that in November 1979, he received telephone calls from customers asking about the warranty on the Bally Arcade. He did not recall receiving an inquiry with respect to repairs on an out-of-warranty unit. Schultz never spoke to anyone named Goldblatt.

Robert E. Wiles, general manager of Bally's Consumer Products Division, testified that Bally sold its product to distributors and wholesalers rather than to the general public. Bally did deal directly, however, with members of the public concerning repairs. Bally did not issue a 90-day tag-on warranty for $25 for any repaired unit. Such a claim in the second advertisement was erroneous.

Wiles testified that after the first advertisement, Bally received numerous telephone calls from its distributors throughout the country. The calls prompted Wiles to issue a memorandum affirming that Bally's warranty policies remained as printed and that its channels of distribution were unchanged. Bally also responded to a number of calls and letters from purchasers of the units offered by JS&A requesting manuals and information about the warranty. Such inquiries continued after the second advertisement.

Following the two advertisements, JS&A received orders for all the Bally Arcades offered for sale. Approximately 3,000 cartridges remained in its inventory. Sugarman had been in the process of preparing another advertisement regarding Bally's products to be run before Christmas. Due to the temporary restraining order, the advertisement was not published.

On December 21, 1979, the trial court granted a preliminary injunction restraining JS&A from "issuing false or confusing advertising regarding [plaintiff] or its products, services, or warranties."

■■ JS&A contends on appeal that Bally was not entitled to preliminary injunctive relief under the Uniform Deceptive Trade Practices Act. Ill. Rev. Stat. 1979, ch. 121½, pars. 311 through 317.

Section 3 of the Act reads, in relevant part:

"A person likely to be damaged by a deceptive trade practice of another may be granted an injunction upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required.

\* \* \*

The relief provided in this Section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State." (Ill. Rev. Stat. 1979, ch. 121½, par. 313.)

In an appropriate situation, a preliminary injunction may be granted to enjoin a deceptive trade practice. (See *Associates for Oral Surgery, Ltd. v. Associates for Oral & Maxillofacial Surgery, Ltd.* (1976), 39 Ill. App. 3d 73, 350 N.E.2d 109.) Deceptive commercial conduct is enjoinable provided there exists a reasonable probability that petitioner will otherwise incur actual damage. Ill. Ann. Stat., ch. 121½, par. 313, Comments of National Conference of Commissioners on Uniform State Laws (Smith-Hurd 1980 Supp.); see *Bonner v. Westbound Records, Inc.* (1977), 49 Ill. App. 3d 543, 364 N.E.2d 570.

A preliminary injunction is an extraordinary remedy which should be granted with the utmost care. (*Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App. 3d 348, 302 N.E.2d 394; *Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill. App. 3d 338, 290 N.E.2d 701.) The purpose of a preliminary injunction is to preserve the status quo pending disposition

of the case on the merits. (*Edgewater Construction Co. v. Percy Wilson Mortgage & Finance Corp.* (1976), 44 Ill. App. 3d 220, 357 N.E.2d 1307.) The granting of a preliminary injunction rests in the sound discretion of the trial court and will not be set aside unless the trial court abused its discretion. *Schlicksup Drug Co., Inc. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 262 N.E.2d 713.

JS&A initially contends that a request for preliminary relief pursuant to section 3 of the Uniform Deceptive Trade Practices Act is governed by the customary rules concerning injunctions. Under these traditional standards, the party seeking injunctive relief must establish a likelihood of ultimate success on the merits of the case and a need to preserve the status quo in order to prevent irreparable injury for which there is no adequate remedy at law. (*Associates for Oral Surgery, Ltd. v. Associates for Oral & Maxillofacial Surgery, Ltd.*) In contrast, Bally urges this court to look solely to the statute itself to determine the elements required for issuance of this "statutory injunction." Under Bally's interpretation, all that is necessary to justify the entry of a preliminary injunction under section 3 is a showing that plaintiff is likely to be damaged by a deceptive trade practice of defendant.

A similar issue was addressed in *Schlicksup Drug Co. v. Schlicksup*, where plaintiff contended that under the Act the usual rules governing the issuance of preliminary injunctions were inapplicable. At that time, section 3 provided that injunctive relief "may be granted * * * in accordance with the principles of equity and upon terms that the court considers reasonable." This court held that the principles of equity require that the customary rules governing the issuance of preliminary injunctions must be followed under section 3. Thereafter, in 1976, an amendment to section 3 deleted the language "injunction against it in accordance with the principles of equity and." Bally thus submits that *Schlicksup* is now of questionable authority and it would be improper to refer to requirements outside section 3 in considering Bally's request for injunctive relief.

■■ The amendment did not render the traditional standards inapplicable to issuance of an injunction under section 3. The deletion was necessary to conform statutory references and provisions to various acts, supreme court rules, and the Civil Practice Act. (Ill. Ann. Stat., ch. 121½, par. 313, Historical Note (Smith-Hurd 1980 Supp.).) The obvious purpose of the amendment was merely to eliminate unnecessary or antiquated references in the statutory provision. The customary standards governing the issuance of preliminary injunctions should continue to be followed in determining whether to grant preliminary injunctive relief pursuant to section 3 of the Act.

■■ JS&A contends that Bally did not prove that absent the preliminary injunction it would suffer irreparable injury for which there was no ade-

quate legal remedy. In deciding this issue, we do not consider the merits of the case nor resolve controverted facts, but rather, determine only whether there was a legal basis to sustain the granting of the preliminary injunction. (*Edgewater Construction Co. v. Percy Wilson Mortgage & Finance Corp.*) Irreparable harm is established where the remedy at law is inadequate in that monetary damages will not adequately compensate plaintiff or cannot be measured by pecuniary standards. (*Hutter v. Lake View Trust & Savings Bank* (1977), 54 Ill. App. 3d 653, 370 N.E.2d 47, *cert. denied* (1978), 439 U.S. 1004, 58 L. Ed. 2d 679, 99 S. Ct. 615.) Irreparable injury does not necessarily mean injury that is great or beyond the possibility of repair or compensation in damages, but is the type of harm of such constant or frequent recurrence that no fair or reasonable redress can be had in a court of law. *General Electric Co. v. UAW Local 997* (1955), 8 Ill. App. 2d 154, 130 N.E.2d 758.

In its complaint, Bally charged that it suffered and would continue to suffer irreparable injury because JS&A's advertisements were causing members of the public to expect services from Bally which it did not perform. At trial, the only evidence concerning injury offered by Bally was Wiles' testimony that after the advertisements appeared, Bally received inquiries from distributors about its warranty and distribution policies. Wiles also indicated that Bally received an increased number of telephone calls and letters from customers requesting instruction manuals and warranty information to which Bally responded.

The mere fact that Bally received telephone calls from distributors does not establish injury or a likelihood of actual injury. There was no admissible evidence disclosing the nature of the inquiries or even whether they were related to the statements in issue in JS&A's advertisements. Bally did not introduce any evidence suggesting that its relationship with its distributors was impaired. In addition, increased customer contact merely requesting manuals and warranty information does not demonstrate a probability of any injury to Bally. Each device was packaged with a manual reciting Bally's name, address and telephone number. Nothing suggested that customers were precluded from contacting Bally for information. The telephone calls and letters could have resulted from the information packaged with the unit rather than from the allegedly false statements in the advertisements.

Bally urges that the injury against which the Act is designed to protect is the likelihood of confusion or misunderstanding. Yet while the evidence presented at the hearing revealed that numerous telephone calls and letters were received following the advertisements, it failed to establish that the nature of the inquiries reflected confusion or misunderstanding about Bally's products or service.

We shall also comment on JS&A's contention that Bally failed to

establish a need to preserve the status quo in order to prevent irreparable injury for which there was no adequate remedy at law. The "status quo" to be maintained is "the last, actual, peaceable, uncontested status which preceded the pending controversy." (*Grillo v. Sidney Wanzer & Sons, Inc.* (1975), 26 Ill. App. 3d 1007, 1011, 326 N.E.2d 180.) The status quo here is represented by the conditions existing on December 6, 1979, following the advertisements and prior to the filing of the complaint.

■■ At that point, JS&A had disposed of its inventory of Bally Arcades and had no further need to advertise that item for sale. Although it still had cartridges in its inventory, JS&A's only misstatement with respect to the cartridges was the ambiguous assertion that JS&A would supply purchasers with Bally's address for future orders. After Bally's complaint, this comment was clarified in the retraction. Where a defendant publishes an acknowledgment of error and expresses regret, and there is no reason to suppose a threat of future misrepresentation of the type which should be enjoined, injunctive relief is unnecessary. (See *Custom Business Systems, Inc. v. Boise Cascade Corp.* (1979), 68 Ill. App. 3d 50, 385 N.E.2d 942.) JS&A published a retraction correcting the previous error concerning warranty coverage and explaining the ambiguity regarding the availability of cartridges from Bally. JS&A thus urges that the evidence does not disclose any likelihood that it would repeat these misrepresentations in future advertisements.

■■ Bally contends, however, that a change in the status quo is probable, pointing out that Sugarman had prepared another advertisement for publication which was stopped by the temporary restraining order. Bally argues that publication of three allegedly false statements in two advertisements demonstrates repetitive conduct in violation of the Uniform Deceptive Trade Practices Act and establishes the likelihood of recurring violations in future advertisements published by JS&A.

We do not believe that the two advertisements constitute a pattern of conduct from which the repetition of the alleged misstatements or the appearance of future advertisements containing misrepresentations about Bally's products or services could be anticipated. Having complied with Bally's demand that the original advertisement be corrected, JS&A is unlikely to disrupt the status quo by repeating objectionable statements in future advertisements. A court should not grant injunctive relief to prevent in the future conduct which in good faith has been discontinued prior to the commencement of the action in the absence of evidence that the offense is likely to be repeated in the future. (*Eads Coal Co. v. United Mine Workers of America* (1975), 27 Ill. App. 3d 692, 327 N.E.2d 115.) Bally did not establish a need to preserve the status quo through the extraordinary remedy of a preliminary injunction.

Furthermore, Bally did not establish that it would not have an ade-

quate legal remedy if it is later proved that the advertising in question was false and caused it injury. If, in order to prevent damage to its reputation, Bally feels obliged to honor the warranty or repair policy as represented by JS&A or supply cartridges or names of dealers, the frequency of such compliance and its costs can be translated into monetary damages. After examining the record, we conclude that Bally did not establish that preliminary injunctive relief was necessary to prevent irreparable injury for which there was no adequate remedy at law.

For the aforementioned reasons, we find that the trial court erred in entering a preliminary injunction restraining JS&A from publishing false or confusing advertisements concerning Bally and its products, services and warranties. Having thus concluded, it is unnecessary to consider the additional points raised by JS&A on appeal.

Accordingly, the order of the circuit court of Cook County granting a preliminary injunction against JS&A is reversed and the preliminary injunction is dissolved.

Reversed.

SIMON and RIZZI, JJ., concur.