LAWTER INTERNATIONAL, INC., Plaintiff-Appellee and Cross-Appellant, *v.* JOHN R. CARROLL *et al*, Defendants-Appellants—(James A. Carroll, *et al*, Defendants-Cross-Appellees).

First District (4th Division) Nos. 82—3050, 83—123 cons.

Opinion filed July 7, 1983.

Vedder, Price, Kaufman & Kammholz, of Chicago, for appellants.

Albert E. Jenner, Jr., of Chicago, for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

These consolidated appeals and cross-appeal involving preliminary injunctive relief derive from an action instituted by the plaintiff, Lawter International, Inc. (Lawter), to restrain the defendants, John R. Carroll, James A. Carroll, Richard M. Bradley and Carroll Scientific, Inc., from competing with Lawter and from disclosing trade secrets. Three broad issues are raised by the parties on appeal: by John R Carroll, whether the trial court erred in issuing a preliminary injunction against John Carroll on November 16, 1982; on cross-appeal by Lawter, whether the trial court erred in failing to extend preliminary injunctive relief to include James Carroll and Richard Bradley on November 16, 1982; and a subsequent cross-appeal by Carroll Scientific as to what is the legal effect of the preliminary injunction which the court issued against Carroll Scientific on January 11, 1983.

The original complaint filed by Lawter in this action arose out of the fact that John Carroll was vice-president of manufacturing of Dyall Products, Inc., a company which made wax compounds for printing ink. John Carroll also owned an option to purchase 25% of the stock in Dyall.

In 1977, Dyall began to negotiate a sale to Lawter. Pursuant to these negotiations, Lawter demanded that John Carroll enter into an employment agreement with Dyall which would become part of the sale to Lawter. The agreement contained a noncompetition covenant, which forbade competition with Lawter for the longer of five years from the date of the contract or three years after termination of employment, and a trade secrets covenant with no apparent time limit, which forbade the use or disclosure of Lawter's trade secrets.

Specific relevant language in the noncompetition covenant is the following:

"Non-competition

A. Employee *** shall not, directly or indirectly, engage in competition with *** Lawter Chemicals, Inc. or any of its subsidiaries:

(i) In any *line of business* which any of such corporations is presently conducting, or

(ii) In any *line of business* which any of such corporations may conduct in the future with respect to which employee may become personally involved pursuant to his employment hereunder and employee shall not render assistance of any kind to any person, firm or any corporation who or which may be in such

competition." (Emphasis added.)

The covenant then contains a detailed description of the business presently being conducted by Lawter. This covenant closes with language which states: "Employee shall not be bound by the provisions of this subparagraph A in the event of termination of his employment hereunder *by the company* without a breach hereof by the Employee." (Emphasis added.)

Specific relevant language in the trade secrets covenant is the following:

### "Trade Secrets

B. Employee recognizes and acknowledges the value to the Company of its *business secrets*, including the methods, processes, formulae, inventions, research, know-how, technical data, marketing information, and other proprietary information developed by it and to be developed by it in the future in the conduct of its business in the production of chemicals and other products. Employee agrees *** that such shall be and remain in the exclusive property of the Company and that he shall have no rights thereto or interest therein. Employee agrees that *** he will hold such trade secrets confidential and will not disclose the same to any other person, firm or corporation ***.

Employee agrees that upon any termination of his employment by the Company *** Employee will deliver to the Company all documents, records, notebooks and similar material containing any of such *trade secrets* which are at that time in his possession." (Emphasis added.)

John Carroll exercised his option to purchase the Dyall stock and upon closing of the sale of Dyall to Lawter on January 3, 1978, received payment from Lawter in the amount of $550,000. On this date, John Carroll executed a letter to Dyall in which he resigned as vice-president-manufacturing of Dyall, but specifically reaffirmed the fact that the letter did not constitute "a resignation from my position as an Employee *** under the Employment Agreement ***." John Carroll was then employed by Lawter in various capacities including Lawter's National Sales Manager from January 3, 1978, until he resigned four years later.

Sometime in August 1981 while still employed by Lawter, John Carroll began planning to go into business to manufacture wax compounds for printing ink. Toward this end, John Carroll joined with his brother James Carroll, who was also employed by Lawter, to form Carroll Scientific, Inc. A loan for $315,000 was procured from the

New Lenox State Bank. In order to procure the loan, the president of the New Lenox Bank was taken on tour of Lawter's Dyall plant. James Carroll then began to purchase equipment for Carroll Scientific and also began designing a plant. Over the next few months, the Carrolls devised a marketing plan for Carroll Scientific and a sales effort was commenced by John Carroll which included calls on Lawter/Dyall customers. As part of the planning process, John Carroll also consulted with an attorney who advised him that the noncompetition covenant in his employment agreement with Lawter was unenforceable.

On January 15, 1982, John Carroll resigned from Lawter and on January 26, 1982, James Carroll also resigned. Richard M. Bradley, a chemist with Lawter/Dyall, also resigned from Lawter at that time and became affiliated with Carroll Scientific.

On March 4, 1982, Lawter commenced the immediate action against defendants John Carroll, James Carroll, Richard Bradley and Carroll Scientific, Inc. Lawter filed a verified complaint for injunctive relief, an accounting and damages; an emergency motion for a temporary restraining order and preliminary injunction; and a motion for expedited access to the premises of Carroll Scientific, Inc. In the underlying action, Lawter prayed that the defendants be enjoined from using the confidential proprietary business information of Lawter which the defendants had obtained or learned while in its employ; that the defendants be enjoined from soliciting and contacting Lawter/Dyall's customers for possible sale of competitive products and that the defendants be enjoined from competing with Lawter/Dyall. The temporary restraining order also directed the defendants to return any and all Lawter documents in their possession.

On the same day, March 4, 1982, and prior to the hearing on the motion for the temporary restraining order, the defendant filed a verified answer denying the material allegations of the complaint and also interposing an affirmative defense that John Carroll's noncompetition covenant was unenforceable under Illinois law because among other things it had no geographical limitations.

The trial court entered the temporary restraining order against all defendants on March 4, 1982. The order specifically stated that its purpose was "to maintain defendant's status quo" until the motion on a preliminary injunction could be fully considered. The order also set specific dates for the hearing on the motion for preliminary injunction. This order was appealed by the defendants on procedural grounds and affirmed in *Lawter International, Inc. v. Carroll* (1982), 107 Ill. App. 3d 938, 438 N.E.2d 590.

In substance, the temporary restraining order stated that Lawter

had a clear right to the protection of its confidential proprietary business information; that Lawter had a clear right to protection under the noncompetition and confidential proprietary business information covenants in John Carroll's employment agreement; and that John Carroll and James Carroll possessed certain confidential proprietary business information belonging to Dyall which might be used by Carroll Scientific when it competed with Dyall. The court also concluded that Lawter was likely to prevail on the merits of its claim that John R. Carroll had breached valid noncompetition and confidential business information covenants in the employment agreement and on its claim that the defendants James Carroll, Bradley and Carroll Scientific had joined with John Carroll in conspiring to breach their fiduciary duties to Lawter and to misappropriate Lawter's proprietary business information. The court also concluded that the plaintiff would suffer serious, immediate and irreparable injury for which no adequate remedy at law existed if a temporary restraining order was not granted.

While the hearing on the preliminary injunction was in progress and the temporary restraining order was on appeal, discovery between the parties went forward. Lawter discovered that the defendants had in their possession several boxes of business information belonging to Dyall. The boxes contained documents relating to dollar volume sales to Dyall customers; the location, shipping address, telephone number and contact person for each customer; information on the quantity of products sold to each customer; the accounts receivable generated through the sales; lists of Dyall's major suppliers with information on quantities ordered; plant costs and expenses; profitability reports; operating statements and a laboratory notebook of a Dyall laboratory chemist. Lawter also was able to ascertain that the defendants had devised certain product formulae from Dyall formulae.

During the duration of these extensive hearings on .the preliminary injunction, the trial court kept the temporary restraining order in place in order to preserve the status quo.

On November 16, 1982, the trial court entered its order on the preliminary injunction. Based upon the evidence before it, the trial court made numerous findings of fact and law which are summarized here. The court found that John Carroll had knowingly breached covenants in his employment agreement prohibiting competition, appropriation and disclosure of confidential business information; that the covenants in the employment agreement were ancillary to the sale of Dyall to Lawter; that the agreement survived the sale and that Carroll had received $550,000 in consideration for the agreement and the

sale of his interest in Dyall; that Lawter would sustain irreparable injury if John Carroll were allowed to use the confidential information including customer lists which he had acquired during his association with Dyall; that Lawter had shown a likelihood of success on the merits because the purpose of the noncompetition covenant was primarily to protect Lawter from losing its "long-standing, near permanent customer relationships" to a former employee and not to "seek to preclude JOHN R. CARROLL from soliciting every ink maker in the world"; that John Carroll had already solicited 10 of the largest Lawter/Dyall accounts located in the United States and Canada; that the five-year time limit after the date of contract or three-year time limit after the date of employment termination for the covenant was not unreasonable in relation to the nature of the interest that Lawter was trying to protect; that John Carroll had acquired certain confidential information regarding formulae and valuable documents which he had misappropriated and that the return of such documents did not preempt preliminary injunctive relief.

In regard to James A. Carroll and Richard Bradley, the court found that the evidence did not support the conclusion that they had conspired with John to breach his employment agreement, to breach their independent fiduciary obligations to the plaintiff, to misappropriate documents containing the plaintiff's confidential business information or that any judicial protection should be extended to Lawter on their behalf for a period beyond the time required for reverse engineering which had already passed. Finally, the court found that there was no reason under these facts to engage in any balancing of the equities and similarly under these facts there was no showing that the plaintiff had come before the court with unclean hands.

After making these findings of fact and law, the court entered the following order, which is quoted and summarized below:

> 1. John Carroll was preliminarily "enjoined and prohibited from soliciting or otherwise contacting any long-term existing customers of LAWTER or its Dyall Products Division for the purpose of selling or offering products competitive with the products sold by LAWTER or its Dyall Products Division."

> 2. John Carroll was also preliminarily enjoined from "having any interest, financial, or otherwise, direct or indirect, in any business entity which solicits or otherwise contacts any long-term existing customers of LAWTER or its Dyall Products Division for the purpose of selling or offering products competitive with products sold by LAWTER or its Dyall Products Division."

3. John Carroll was preliminarily enjoined from "revealing to anyone or using for competition with LAWTER or its Dyall Products Division, LAWTER's or its Dyall Products Division's confidential product formulas, manufacturing and protection processes, marketing information, research and development information, and customer requirements information, whether written or memorized based in any way" upon certain plaintiff's exhibits.

4. "The Temporary Restraining Order as to JAMES A. CARROLL and RICHARD M. BRADLEY, *only,* is hereby dissolved." (Emphasis added.)

It is important to note that neither the court's findings of fact or law nor the above order made any specific, independent mention of Carroll Scientific.

Based upon these conclusions of fact and law, the court then entered an order which preserved the injunctive relief against John R. Carroll and denied injunctive relief as to defendants, James Carroll and Bradley.

John Carroll appealed from this preliminary injunction order on November 17, 1982, and Lawter cross-appealed shortly thereafter. Although Carroll Scientific is named in the notice of cross-appeal, no relief is requested as to Carroll Scientific in the cross-appeal. Carroll Scientific is the subject of the January 11, 1983, order and the appeal from that order. John Carroll claimed in his appeal that the court erred in its conclusion that the employment agreement was valid and a proper foundation upon which to grant Lawter a preliminary injunction enjoining his business activities. Lawter claimed in its cross-appeal that the court erred when it failed to include James Carroll and Bradley in the order for a preliminary injunction.

In response to certain actions taken by the defendants while these appeals were pending, Lawter filed an emergency motion with the trial court on December 10, 1982, 3½ weeks after the preliminary injunction against John Carroll. In its motion and supporting brief, the plaintiff alleged that within three days of the issuance of the preliminary injunction, the defendants had put a secret scheme into operation to circumvent and violate the terms of the preliminary injunction. Pursuant to this alleged scheme, Lawter charged that Carroll Scientific had commenced operation as a business entity with the purpose of soliciting and selling competing products to Dyall customers and that James Carroll had agreed to purchase John Carroll's entire interest in Carroll Scientific by way of an installment purchase plan. Under this installment plan, James Carroll had already issued certain

promissory notes to John Carroll. According to Lawter, by virtue of this scheme, the defendants were able to completely shift John Carroll's interest in Carroll Scientific to James Carroll and to begin to employ John Carroll's assets to compete with Lawter in direct violation and evasion of the trial court's preliminary injunction order. In its prayer for relief, Lawter requested the court to issue four separate orders: (1) an order compelling John Carroll to comply fully with the November 16, 1982, order; (2) an order enjoining James Carroll and Carroll Scientific from soliciting long-term existing customers of Lawter "until such time as the court deems appropriate to insure that the equity intended by the order of November 16, 1982 is accomplished"; (3) an order "specifically including Carroll Scientific, Inc. within the reach" of the November 16, 1982, order; and (4) an order enjoining James Carroll from using Lawter's alleged confidential business information similar to the injunction the trial court had entered against John Carroll.

On December 29, 1982, the trial court heard oral arguments on this emergency motion. Two discovery depositions, both dated December 6, 1982, were placed in evidence. In one of these depositions, John Carroll admitted that he had signed a purchase agreement with his brother James on November 22. Under this agreement, John sold James his entire interest in Carroll Scientific. The purpose of the transaction, according to John, was to conform to the requirements of the preliminary injunction by eliminating his involvement with Carroll Scientific. John also stipulated that Carroll Scientific was a business entity which "has or intends to solicit long-term existing customers of Lawter *** for the purpose of selling them *** competitive *** products."

In the other discovery deposition, James Carroll admitted that he had purchased his brother's interest in Carroll Scientific. On the advice of counsel, James refused to answer questions relating to actions taken by Carroll Scientific since the issuance of the preliminary injunction.

On January 11, the trial court issued the order partially quoted and partially summarized below:

"1. The court reiterates its intentions expressed in its temporary restraining order extended on March 22, 1982 and its preliminary injunction entered on November 16, 1982 to preserve the status quo;"

2. The court reiterates its intention expressed in its preliminary injunction to dissolve its temporary restraining order "as to JAMES A. CARROLL and RICHARD M. BRADLEY";

3. Carroll Scientific, Inc. remains and is bound by the terms of this court's order.

4. John R. Carroll and Carroll Scientific, Inc., as well as their employees, agents, representatives, and any and all persons acting in concert with them, shall place themselves immediately in full compliance with this Court's orders;

5. The defendants John R. Carroll and Carroll Scientific, Inc. shall take no further actions except to "appeal from any order to alter the *status quo* under which this Court intended to preserve by its orders until a trial can be held on the merits of this case."

Carroll Scientific then appealed this January 11 ruling and the pending appeals were consolidated.

 The first issue on appeal is whether the trial court erred in entering a preliminary injunction against John Carroll. Although John Carroll claims that a noncompetition covenant contained in an employment agreement is *per se* unenforceable because it has no geographical limitation (see *Parish v. Schwartz* (1931), 344 Ill. 563, 176 N.E. 757), we believe that under current Illinois law the question of the geographical scope of a covenant not to compete is only one of the factors to be considered by a court in determining a covenant's enforceability and not the final test. This factor may be relatively insignificant as in cases where there are special circumstances, such as customer lists, customer contacts, trade secrets or other confidential information to be protected (see *In re Solar Textiles Co. v. Fortino* (1964), 46 Ill. App. 2d 436, 196 N.E. 2d 719; *Smithereen Co. v. Renfroe* (1945), 325 Ill. App. 229, 59 N.E.2d 545) or the lack of geographical scope may be determinative as in situations where territorial restrictions as to salesmen or routemen are greater than the area that was served by these employees on behalf of the former employer. In this latter situation, the cases almost uniformly hold that excluding service occupations from an entire State by such a covenant is unreasonable. The rationale behind making geography determinative in this situation is that the employee should be excluded only from territory in which, as a result of his employment, he was able to establish a certain relationship with the employer's customers. (*Central Keystone Plating of Illinois, Inc. v. Hutchison* (1965), 62 Ill. App. 2d 188, 210 N.E. 2d 239.) The rationale behind making geography a less significant factor in the case where special circumstances exist is that the restraints should be commensurate with the need to protect the employer. The employer is entitled to have his interest in his trade secrets protected, such as secret processes of manufacture which may

be of vast value and that protection may be secured by restraining the employee from divulging these secrets or putting them to his own use. The employer is also entitled not to have his old customers, by solicitation or such other means, enticed away from him. *Brunner & Lay, Inc. v. Chapin* (1961), 29 Ill. App. 2d 161, 172 N.E.2d 652; *Rhoades v. Clifton Gunderson & Co.* (1980), 89 Ill. App. 3d 751, 411 N.E.2d 1380.

We believe that under the above analysis, geography is only one of the factors to be considered in the enforceability of an employment agreement whether a simple employment agreement is involved or an agreement ancillary to the sale of a business. Therefore it is the function of the court to put the appropriate emphasis on this factor and consider it along with other factors in its ultimate determination as to whether to enforce an employment agreement.

■ Under the instant facts, the plaintiff alleged and presented evidence to the trial court to prove special circumstances in the creation and prospective enforcement of this employment agreement. Lawter alleged that John Carroll had in his possession certain trade secrets and customer lists which were its proprietary business information and that John Carroll was about to use this information to compete with the plaintiff contrary to his employment agreement. On the basis of these facts, we do not believe that the trial court erred when it determined that this noncompetition clause without a geographical limitation was valid because the restraint was not greater than necessary to protect the employer. *Rhoades v. Clifton Gunderson & Co.* (1980), 89 Ill. App. 3d 751, 411 N.E.2d 1380.

John Carroll next argues that even if the noncompetition covenant is not unreasonable *per se* because it lacks geographical limitations, it cannot be enforced against him because he did not fully participate in negotiating the agreement, because the agreement did not survive the sale to Lawter, because the agreement did not survive his promotion to Lawter's national sales manager, because it is unreasonable as to geography and time, because no trade secrets are involved, because customer information is not a protectable interest, and because the court did not enforce the noncompetition and trade secrets covenants as written but impermissibly modified them.

In addition to the above claims based on the defendant's perceived nonenforceability of the employment agreement, John Carroll also makes claims that the evidence did not support the conclusion that Lawter would suffer irreparable injury, that the evidence did not support the conclusion that the court properly balanced the equities in this case and that the evidence did not support the court's rejection of

John Carroll's unclean hands defense.

In order to respond to Carroll's arguments, it is necessary to keep sight of the purpose of a preliminary injunction, the necessary showing to obtain a preliminary injunction and the function of the trial court in issuing a preliminary injunction.

■ The function of the trial court in considering a motion for a preliminary injunction is to grant the injunction if it finds (1) that there is a certain and clearly ascertainable right that needs protection, (2) that the movant will suffer irreparable injury if the injunction is not granted, (3) there is no adequate remedy at law, and (4) the movant has a likelihood of success on the merits. These factors must be established by a preponderance of the evidence. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 422 N.E.2d 1166.) The trial court has a great deal of discretion in granting or denying an injunction. A reviewing court will only reverse the trial court if it finds that the granting or denial of the preliminary injunction was against the manifest weight of the evidence. *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 363 N.E.2d 6.

■ To prevail in its action for a preliminary injunction, it was necessary for Lawter to demonstrate a likelihood of success on the merits. (*Simpkins v. Maras* (1958), 17 Ill. App. 2d 238, 149 N.E.2d 430.) Lawter was not required to make out a case which in all events would warrant relief at the final hearing; Lawter needed only to raise a fair question as to the existence of its right to its claim and lead the trial court to believe that it would probably be entitled to such relief if its proof should ultimately sustain its allegations. *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 329 N.E.2d 414.

Based on the voluminous record in this case, we believe that Lawter was able to raise a fair question as to the validity of the employment agreement and its right to have the agreement enforced against John Carroll. More specifically, we believe the court could reasonably conclude, contrary to John Carroll's contentions, that John Carroll had intended to sign a legally valid document whether or not he had fully participated in its negotiation, that John Carroll had intended to have the agreement survive the sale of Dyall to Lawter because he wrote a letter to Dyall on the date of the sale which apparently reaffirmed the existence of the employment agreement, and that the non-competition covenant in the agreement survived Carroll's promotion to Lawter's national sales manager because he continued to work for the same organization and thus this was not "a termination of his employment hereunder by the company" as Carroll claims.

■ We also believe that the trial court could reasonably conclude

that the employment agreement should be enforced against John Carroll. The language of the agreement carves out Lawter's "line of business" for protection as well as Lawter's "business secrets." We believe that the trial court was reasonably trying to protect these areas and did not engage in impermissible modification of these terms when it concluded that Lawter's long term, near permanent customer lists warranted protection under this language as well as its other confidential business information. We find no merit in John Carroll's argument that Lawter had no confidential business information to protect because it was not Lawter's practice to mark its documents "confidential" or keep them under "lock and key." The absence of such precautions did not give Carroll license to unilaterally remove such documents from the premises of his former employer.

Nor do we find John Carroll's argument as to the unreasonableness of the geographic and time terms in the agreement convincing. As we understand it, Carroll's argument here is that the time term is unreasonable because there was a five-year time limit to the agreement if he resigned the minute he signed the document and a more indefinite three years after termination of employment if he chose to stay with the company. John Carroll also states that his former employer, who also signed such an agreement at the sale of Dyall, had the advantage of the five-year term because he resigned immediately. Since John Carroll had control over this commitment and opted for the three-year term when he decided to stay with Lawter and also because the longer he stayed the greater his knowledge of Lawter's intimate business information became, we do not believe that under the facts in this record John Carroll made a sufficient showing before the trial court that the time term should not be enforced against him. As for the reasonableness of the geographic term, geography is relevant only to "line of business" and is appropriate under these facts.

■ We also disagree with John Carroll's contention that the trial court erred when it concluded that the evidence showed irreparable injury to Lawter if a preliminary injunction were not issued. John Carroll claims that the trial court's finding of irreparable injury is clearly erroneous because long-standing customer relationships are protected only if they are exclusive; because there was no evidence in the record that Lawter had near permanent, exclusive relationships with any of his customers; because the relative financial position of the parties made irreparable injury to Lawter most unlikely and because Lawter had already realized almost 2½ times its initial investment in Dyall.

We fail to see how these assertions on the part of John Carroll

compel the conclusion that the trial court erred when it held that Lawter would suffer irreparable injury. In its original complaint, the plaintiff alleged that it would suffer irreparable injury unless the defendants were restrained from using Lawter's confidential and proprietary business information, from establishing their planned rival business in competition with Lawter, from exploiting prior breaches of contract and of loyalty to Lawter with respect to customers and employees, from using Lawter's confidential business information to injure Lawter in its business and property, from depriving Lawter of the good will which it had purchased with Dyall and from generally causing injury to Lawter for which there was no adequate remedy at law.

Under Illinois case law, an alleged injury is defined as irreparable in a variety of circumstances. The injury has been defined as irreparable when the injured party cannot be adequately compensated in damages; when the damages cannot be measured by any certain pecuniary standards; when the injury could possibly be compensated for in damages but the injury is of that species which ought not to be submitted to on one hand or inflicted on the other hand; or when the plaintiff will be subject to transgressions of a continuing nature, constant and frequent, such that no meaningful redress can be had at law. *Cross Wood Products, Inc. v. Suter* (1981), 97 Ill. App. 3d 282, 422 N.E.2d 953; *Simpkins v. Maras* (1958), 17 Ill. App. 2d 238, 149 N.E.2d 430; *Bally Manufacturing Corp. v. JS&A Group, Inc.* (1980), 88 Ill. App. 3d 87, 410 N.E.2d 321.

We believe that under the facts in this case, where the defendant was about to use the plaintiff's own confidential information, customer lists, and formula to go into business and compete with the plaintiff, it was reasonable for the court to conclude that Lawter had made an adequate showing of irreparable injury under many of the above circumstances. More particularly, we believe that the factual situation present here gives rise to the conclusion that the plaintiff will be subject to transgressions of a continuing nature, constant and frequent, such that no meaningful redress can be had at law. *Bally Manufacturing Corp. v. JS&A Group, Inc.* (1980), 88 Ill. App. 3d 87, 410 N.E.2d 321.

Carroll's two remaining arguments as to why the trial court erred in issuing a preliminary injunction against him involve his claim that the court failed to properly balance the equities in this case and his claim that the court's conclusion that his unclean hands defense was at this point and time irrelevant. In regard to the balancing of equities claim, the court found that the doctrine of the balancing of equi-

ties was inapplicable here because "the existence of a private right and its violation is clear." Since Carroll cites us to no authority to indicate why this conclusion is erroneous as a matter of law, we shall only address ourselves to John Carroll's claim that it is erroneous as a matter of fact. According to John Carroll, far more damage will be done to him by depriving him of his means of a livelihood than will be done to Lawter if he is allowed to compete with Lawter until a trial on the merits in this case. We believe that it was reasonable for the trial court to conclude that in the light of the existence of a valid employment agreement and an adequate showing of irreparable injury, it was unnecessary to begin to balance the equities. In regard to John Carroll's unclean hands defense, John Carroll bases this claim on the fact that the former owner of Dyall had allegedly signed a consulting agreement with Lawter and that Lawter at some point had told John Carroll that such an agreement had not been executed. The trial court held that this fact had no bearing on the issues in this particular case at this particular time. We also fail to see how this consulting agreement is relevant here.

Having decided that the trial court did not err in issuing preliminary injunctive relief against John Carroll, we shall now consider the second broad issue raised by the parties in this appeal. The issue involves Lawter's contention on its cross-appeal that the trial court erred in failing to extend preliminary injunctive relief to include James Carroll and Richard Bradley. In its brief, Lawter summarizes its argument on this point by stating that it should have been clear to the trial court that all of the defendants have played key roles in a conspiracy to assist John Carroll to breach his employment agreement and use Lawter's confidential formulae, manufacturing processes, costs, prices, marketing and customer requirements data to compete against Lawter, all in violation of their fiduciary responsibilities to Lawter. Therefore in dissolving the temporary restraining order as to James Carroll and Richard Bradley and then failing to include them in his preliminary injunction order against John Carroll, the trial court left them free to continue the conspiracy to aid and abet John Carroll to breach his contractual obligations and to misuse Lawter/Dyall confidential proprietary business information. Furthermore, according to Lawter, John Carroll was then afforded the ability to accomplish through his fellow conspirators what the trial court had enjoined him from doing directly.

In regard to James Carroll and Richard Bradley, the trial court found that the evidence did not support the conclusion that they had conspired with John Carroll to breach his employment agreement;

that they had breached their independent fiduciary obligations to the plaintiff; or that they had misappropriated documents containing the plaintiff's confidential business information. The court also concluded that judicial protection should not be extended to Lawter on their behalf for a period beyond the time required for reverse engineering which had already passed.

■ All of the issues raised by Lawter in this cross-appeal are questions of fact concerning the activities of Bradley and James Carroll. We have already stated that a reviewing court will only reverse the trial court on factual matters if it finds that the granting of the preliminary injunction was against the manifest weight of the evidence. (*La Salle National Bank v. Triumvera Homeowners Association* (1982), 109 Ill. App. 3d 654, 440 N.E.2d 1073.) Furthermore there is a strong presumption in favor of the findings of the trial court which has heard the testimony of witnesses, observed their demeanor, considered the documentary evidence and the pleadings, and has heard the oral arguments of counsel. *Marth v. Illinois Weather-Seal, Inc.* (1977), 50 Ill. App. 3d 577, 365 N.E.2d 588.

■ ■ In reviewing the record, we do not believe that evidence before the court supports the conclusion that Lawter had made an adequate showing of likelihood of success on the merits in its claims that the activities of James Carroll and Bradley rise to the level of a conspiracy to breach John Carroll's employment agreement, of a breach of their own independent fiduciary obligations to the plaintiff or of a misappropriation of documents which, after the passage of time and the return of the documents, still warranted legal redress. With regard to Bradley, the evidence established that he did not participate in misappropriating any confidential documents of the plaintiff and that he did not perform any activity on behalf of Carroll Scientific prior to his resignation from Lawter. With regard to James Carroll, the evidence supported the conclusion that he had not induced Bradley to leave Lawter and that the culpability accruing to his participation with John Carroll in misappropriating certain documents had been cured by return of the documents and by the passage of time necessary for reverse engineering. Other activities on the part of James Carroll such as obtaining financing for Carroll Scientific, designing a production plant, purchasing equipment and supplies are more reasonably classified as preliminary competitive activities rather than activities in breach of a fiduciary duty to his employer. It is recognized that an employee, absent a restrictive contractual provision, has a right to enter into competition with the former employer upon leaving such employ. (*Cross Woods Products v. Suter* (1981), 97 Ill. App. 3d 282,

422 N.E.2d 953.) Indeed, an employee may legitimately go so far as to form a rival corporation and outfit it for business while still employed by the prospective competitor. (See *James C. Wilborn & Sons Inc. v. Heniff* (1968), 95 Ill. App. 2d 155, 237 N.E.2d 781.) An employee is held accountable for breaching his fiduciary duty to his employer only when he goes beyond such preliminary competitive activities and commences business as a rival concern while still employed. (*Cross Woods Products v. Suter* (1981), 97 Ill. App. 3d 282, 422 N.E.2d 953.) Since all the parties are in agreement that Carroll Scientific did not commence operation as a business entity with the purpose of soliciting and selling competing products to Dyall customers until after the preliminary injunction against John Carroll was in place, almost nine months after James Carroll and Bradley had resigned from Lawter, we believe that the trial court could correctly characterize these activities as preliminary competitive activities.

The final issue on appeal involves injunctive relief against Carroll Scientific. Lawter contends that the temporary restraining order entered on March 2, 1982, against Carroll Scientific survived the November 16, 1982, preliminary injunction even though Carroll Scientific was not preliminarily enjoined in the order. Alternatively, Lawter argues that the court erred in not preliminarily enjoining Carroll Scientific in the November 16 order and further that the preliminary injunction entered on January 11, 1983, against Carroll Scientific was appropriate.

Carroll Scientific responds that the temporary restraining order had expired on November 16 and that there was insufficient evidence to enter a preliminary injunction against Carroll Scientific on that date. Carroll Scientific further claims that the court had no jurisdiction to enter the January 11 order because Lawter had filed a notice of cross-appeal against Carroll Scientific because it had not been preliminarily enjoined on November 16. Additionally, Carroll Scientific contends that if the court did in fact have jurisdiction subsequent to November 16, there was insufficient evidence before the court upon which to base injunctive relief.

■■ ■ As to the temporary restraining order, it is the law of this case that the temporary restraining order entered on March 4, 1982, and extended on March 22, 1982, expired on November 16, 1982, with the issuance of the preliminary injunction. This court's prior ruling in *Lawter International, Inc. v. Carroll* (1982), 107 Ill. App. 3d 938, 942, 438 N.E.2d 590, 592, explains that "[T]he purpose of a restraining order is to maintain the status quo *until* both parties can appear before the court and present evidence on the preliminary

injunction." (Emphasis added.) Various authorities have considered the question of when a temporary restraining order terminates. 42 Am. Jur. 2d *Injunctions* sec. 317 (1969) provides: "When a determination of the propriety of granting the preliminary injunction has been made, the whole force of the restraining order ceases by its own limitations." 43 C.J.S. *Injunctions* sec. 10 (1978) states: "The force of the restraining order ceases on hearing of the application for a temporary injunction, or on the granting or refusal of the injunction without any express order to that effect. Where a restraining order has terminated as a matter of law, the belief of the parties and the judge to the contrary will not change it." Based upon these authorities, we conclude that the trial court was in error when it declared that "Carroll Scientific, Inc. remains and is bound" by the temporary restraining order. As a matter of law, a temporary restraining order does not survive the issuance of a preliminary injunction. Thus the temporary restraining order against Carroll Scientific ceased at the point in time that the order on the preliminary injunction was issued against John Carroll and Carroll Scientific was not enjoined.

 Regardless of whether the trial court retained jurisdiction to enter a subsequent preliminary injunction against Carroll Scientific, we believe that there was insufficient evidence to enjoin Carroll Scientific in the November 16 order and that there was insufficient evidence upon which to grant preliminary injunctive relief against Carroll Scientific on January 11.

Lawter alleged that Carroll Scientific, along with James Carroll and Richard Bradley, was part of a conspiracy to violate the covenants of John Carroll's employment agreement with Lawter. As of November 16, the trial court found insufficient evidence of such a conspiracy. The court specifically found that neither James Carroll nor Bradley had breached their independent fiduciary obligations to Lawter; that Bradley, James Carroll and Carroll Scientific had no independent responsibilities to Lawter under John Carroll's employment agreement; that James Carroll and Bradley had not misappropriated documents containing Lawter's confidential business information; and that judicial protection should not be extended to Lawter for a period beyond the time required for reverse engineering which had already passed. Thus under the November order, James Carroll and Carroll Scientific were free to go into business against Lawter.

The only new evidence before the court subsequent to the November 16 order was that John Carroll had sold his interest in Carroll Scientific to his brother James Carroll. John Carroll divested himself of all ownership of Carroll Scientific's stock and ceased participating in

its activities. By such actions, Carroll Scientific claims that John Carroll was merely trying to comply with the terms of the November 16 order. Since Lawter was unable to present any new evidence concerning a conspiracy other than depositions which only testified to the completion of the sale, we believe that there was insufficient evidence to support the court's conclusion that Carroll Scientific should be enjoined on January 11.

For the above reasons we affirm the order of November 16 and reverse the order of January 11.

ROMITI, P.J., and JOHNSON, J., concur.