HAMER HOLDING GROUP, INC., *et al.*, Plaintiffs, v. STEPHEN C. ELMORE, Defendant-Appellee (First United Property Management, Inc., Plaintiff-Appellant).

First District (2nd Division) No. 1—89—0288

Opinion filed August 14, 1990.—Rehearing denied October 9, 1990.

Marshall N. Dickler, Ltd., of Chicago (S. Keith Collins and Marshall N. Dickler, of counsel), for appellant.

Nisen & Elliott, of Chicago (Michael J. Daley, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff First United Property Management, Inc., brings an interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (107 Ill. 2d R. 307(a)(1)) from an order denying its motion for a preliminary injunction seeking to enforce a restrictive covenant against defendant Stephen C. Elmore and to obtain relief under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*). Specifically, plaintiff seeks to enjoin defendant from competing in the business of managing certain types of real estate for a period of three years within a 75-mile radius of downtown Chicago.

Plaintiff presents two issues for our review: (1) whether the circuit court erred in its determination that defendant's covenant not to compete was ancillary to his employment contract rather than to the sale of his business, a decision which led the court to apply a stricter test of enforcement and consequently to deny a preliminary injunction; and (2) whether the circuit court erred in deciding that plaintiff's customer list was not a trade secret under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*). Defendant raises yet a third issue, urging us to forego construing his restrictive covenant altogether and to hold that the assignment by which plaintiff succeeded to the employment agreement containing the covenant was invalid and thereby failed to confer upon plaintiff standing to sue for injunctive relief.

## I. BACKGROUND

Defendant Stephen C. Elmore (Elmore) was the sole owner and chief executive officer of AMCO Realty and Management Company (AMCO), engaged in the business of managing condominium and homeowners' associations, from its incorporation in Illinois in 1979. Among AMCO's clients dating back to 1979 and 1980 were Cress Creek Condominium Association (Cress Creek), North Valley-Lo Condominiums (Valley-Lo), and Piers Condominiums (Piers).

On March 15, 1984, as president of AMCO, Elmore signed a contract with First Eagle Holding Company, Inc. (Holding Group),[1] for the sale of AMCO. Under the contract, entitled "Acquisition Agreement," AMCO conveyed to the Holding Group all of its assets, including customer lists and business records, goodwill and going concern,

---

[1] Incorporated on March 30, 1983, First Eagle Holding Company adopted the assumed name of Hamer Holding Group, Inc., on May 11, 1984; reverted to First Eagle Holding Company on December 10, 1985; and again changed its name to Hamer Holding Group, Inc., on December 13, 1985.

employment and other service contracts, and the corporate name "AMCO Realty and Management Company." Paragraph 24 of the acquisition agreement contained a clause permitting its assignment. Paragraph 2(a) provided that the aggregate purchase price of the acquired assets would be $886,000, and the value assigned to each individual category of assets was as follows: computer equipment $40,000; leasehold improvements $5,000; equipment $15,000; receivables $25,000; contracts $795,000; goodwill and going concern $5,000; trade names $1,000.

Paragraph 3(a)(iv) stated that as a condition precedent to the obligations of the parties, Elmore was to execute and deliver an employment agreement, attached to the acquisition agreement as an exhibit, on or before the date of closing, March 30, 1984. Paragraph 8 required the seller to produce the executed employment agreement at the closing as a necessary document. Paragraph 15 contained a set-off provision whereby in the event Elmore terminated his employment with the buyer before the employment agreement expired, the buyer reserved the right to reduce the aggregate purchase price by $3,000 for every month of employment remaining under the terms of the employment agreement. Finally, paragraph 16 incorporated by reference all exhibits and attachments and provided that all agreements executed by the parties in connection with the acquisition agreement would constitute the entire agreement.

On March 26, 1984, four days prior to the closing of the acquisition agreement between AMCO and the Holding Group, the Holding Group assigned the acquisition agreement to its wholly owned subsidiary, First United ICI, Inc. (First United I).[2] Thus, the parties to the closing on March 30, 1984, were AMCO (seller) and First United I (buyer). The parties to the employment agreement, which was executed that same day, were Elmore (employee) and First United I (employer). The employment agreement, as it existed on March 15, 1984, in the form of an unexecuted document attached as an exhibit to the acquisition agreement, already set forth First United I as the employer.

The employment agreement contained, among others, the following terms. In paragraph 1, Elmore agreed to be "responsible for management services rendered to condominiums and cooperative associations and rental apartment units." Paragraph 2 stated that the

[2]Incorporated on January 12, 1979, First United ICI, Inc., adopted the name First United AMCO Realty and Management Company on May 4, 1984, then changed its name to First United Property Management, Inc., on January 23, 1986.

agreement covered Elmore's employment for a term of one year, from March 30, 1984, to March 30, 1985. Under Paragraph 3, Elmore was to receive a salary of $2,000 per month. Paragraph 9B permitted the transfer of all rights and duties under the agreement to "the heirs, executors, assigns, transferees, and successors in interest of the parties, notwithstanding the reorganization, merger, consolidation or change in personnel of Employer."

Contained in the employment agreement was a covenant not to compete, which stated:

"*7. Covenant Not to Compete*

Employee agrees that during the term of this Agreement he will not directly or indirectly consult with, or render services for or in any manner engage in a business competing with the business of Employer anywhere within a seventy-five (75) mile radius of Monroe and Dearborn Streets, Chicago, Illinois (Restricted Area). Employee further agrees that for a period of three (3) years following the termination of his employment with Employer he will not directly or indirectly consult with or render services for clients of Employer whether or not such clients became clients of Employer through efforts made by or on behalf of Employee or in any manner engage in a business competing with the business of Employer anywhere in the Restricted Area.

Employee agrees that during the term of this Agreement and for a period of three (3) years following the termination of his employment with Employer, he shall not consult with, render services for or in any manner engage in a business competing with the business of Employer within the Restricted Area with regard to any person, persons or companies that had been contacted by Employee for the purpose of securing such parties as clients of Employer. In the case of termination, such covenant for such three year period following termination shall be with regard to all such parties contacted by Employee or on behalf of Employer by Employee during the previous 12 month period preceding termination.

If, at the time of enforcement of this paragraph 8 [*sic*], a court shall hold that the duration, scope or area of restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area. This covenant on the part of Employee shall be construed as a covenant independent

of any other provisions of this Agreement, and the existence of any claim or cause of action of Employee against Employer whether predicted [*sic*] on this Agreement or otherwise shall not constitute a defense to the enforcement by Employer of this covenant.

In the event of the breach of Employee of this paragraph 8 [*sic*], Employer, in addition and supplementary to other rights and remedies existing in its favor, may apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violation of the provisions hereof."

With regard to confidentiality, the employment agreement stated:

"8. *Confidentiality*

Employee recognizes that certain knowledge and information which might be obtained by him in the course of his employment hereunder with respect to the conduct and details of Employer's business are of a confidential nature. Employee agrees that he will not disclose any information which he has learned of by virtue of his employment by Employer either directly or indirectly, or use of any such information in any way either during the term of this Agreement or at any time thereafter. All files, records, documents, data, equipment, experiments, lists and similar items relating to the business of Employer, whether prepared by Employee or otherwise coming into his possession, shall remain the exclusive property of Employer and shall not be used by Employee or removed from the premises where the work of Employer is. being carried on, except at the direction of Employer, or in the course of the performance of Employee's regular duties for Employer. However, such material may be used and removed by Employee with prior written consent of Employer. In the event that this paragraph 9 [*sic*] is breached, Employer may, in addition and supplementary to other rights and remedies existing in his favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof."

After acquiring AMCO, First United I assumed the management of Cress Creek, Valley-Lo and Piers. In addition to continuing AMCO's business, First United I also engaged in the management of town homes and some commercial property. Elmore continued in his position as the company's chief executive officer and remained in

charge of its condominium and homeowners' association management business until he chose to terminate his employment on March 1, 1988.

On October 31, 1988, First United I sold its assets, its business and its name to Studio 2, Inc., which later became First United Property Management, Inc. (First United II).[3] The employment agreement between Elmore and First United I, assignable by its own terms, was one of the assets specifically transferred to First United II in the contract of sale. First United II has since continued the business of First United I without interruption, including the management of Cress Creek, Valley-Lo and Piers.

The president of First United II is Mark Maute, who was previously employed by AMCO and who worked with Elmore from 1979 until Elmore sold AMCO to First United I in 1984. Maute joined First United I in 1987 as its marketing director, and when Elmore resigned on March 1, 1988, Maute took over Elmore's responsibilities, which included the development of new condominium and homeowner association clients.

During the 30-day period of negotiations which took place before the October 31, 1988, closing of the sale to First United II, Elmore's attorney contacted Christopher Picone, senior vice-president of the Holding Group, to discuss the possibility of the Holding Group's releasing Elmore from certain portions of his employment agreement. The matter was never resolved.

On or about November 1, 1988, Elmore spoke to Maute, and, according to Elmore's own testimony, told Maute he wanted to be released from any potential liability under the employment agreement with respect to four properties being serviced by First United II. Those properties included Cress Creek, Valley-Lo and Piers, which, as noted above, Elmore had managed personally, and each of which was within the 75-mile geographical area specified in the restrictive covenant.

Picone also received a letter from Elmore's attorney dated November 2, 1988, in which he expressed Elmore's intent to create a new business offering real estate management services in Du Page County, Illinois. Du Page County is within the 75-mile radius prescribed in Elmore's restrictive covenant.

Marshall Dunlop, president of Cress Creek, testified that in the

---

[3]Studio 2, Inc., was incorporated in Illinois on October 25, 1988. To reflect the acquisition of its rights to the seller's corporate name Studio 2, Inc., adopted the name of First United Property Management, Inc., on December 5, 1988.

latter part of November 1988 Elmore made a proposal to him to take over the management of Cress Creek, which at that time was under the management of First United II. Elmore followed up with a written proposal on November 21, 1988, which he presented to the association's board later that week. Two or three days thereafter, Dunlop advised Elmore that the board had accepted his proposal. Cress Creek then notified First United II that it was terminating its services effective December 31, 1988.

Maute testified to a telephone conversation between himself and Elmore on November 30, 1988, two days before the instant lawsuit was instituted. During that conversation Elmore warned Maute that if he prevented him from managing Cress Creek he was "prepared to go down in flames and take everyone else with him." Elmore also threatened that he would send a letter to all of the client associations in Maute's current portfolio, alleging specific breaches of fiduciary duties by the company towards its clients. Elmore testified that after this suit was filed he withdrew his proposal and forewent the opportunity to manage Cress Creek.

Maute also testified to the efforts which First United I expended in developing and guarding the customer information plaintiff seeks to protect under the Illinois Trade Secrets Act. Maute stated that the client information consists primarily of the names, home addresses, and home and work telephone numbers of the officers and directors of First United I's homeowners' and condominium association accounts.

The process of developing new clients begins with reviewing a list of not-for-profit corporations available from the Illinois Secretary of State. A list of target customers is distilled manually by geographic target area, then put into usable form for mail solicitation purposes. Because the information from the Secretary of State is not always current or complete, it requires updating and identifying telephone numbers of board members for the purpose of personally following up on responses to the mail solicitations.

Under Maute's direction, First United I did two mass mailings in 1987 to market its services to new clients. Together, the mailings included about 4,500 individual names and produced eight new accounts. Maute estimated that each account cost from $8,000 to $10,000 to develop, an expense that included marketing salaries and the cost of redacting and formatting the information from the Secretary of State, mailing solicitations and preparing proposals and presentations.

The actual client list containing the names of board directors

and their contact information is not computerized; rather, it is maintained at a central location in a single three-ring binder which is not under lock and key because of the need to use it daily as a ready reference.

Elmore testified that as chief executive officer of First United I he regularly provided other, noncompeting subsidiaries of the Holding Group with information regarding First United I's clients. Maute testified that, after Elmore left First United I, Maute handled the client information requests from other subsidiaries, and because they sought the identities of property owners rather than board members, Maute did not divulge any of the board member information that plaintiff seeks to protect.

Maute testified further about the importance of client longevity. He stated that effective management of a real estate enterprise requires the manager to become intimately familiar with the physical characteristics of the property, the unique internal operational needs of the client, the personalities of the board of directors and the individual manner in which the board wishes to conduct the association's activities. In the hands of a competitor, this knowledge would be very valuable, because otherwise the competitor "would have to learn all that information from ground one." Furthermore, extensive interpersonal contact with board members as well as property·owners is of the utmost importance. Finally, Maute testified that Elmore had this type of intimate knowledge and personal contact and rapport with the clients of AMCO and later with those of First United I. Elmore testified that he had been personally involved with Cress Creek, Valley-Lo and Piers for almost nine years, "so I had known those condominiums very well and they had known me very well and on a personal basis."

Plaintiffs Holding Group (Hamer Holding Group, Inc.), First United I (First United Property Management Company, Inc.) and First United II (Studio 2, Inc.) filed a complaint on December 2, 1988, seeking preliminary and permanent injunctive relief to enforce Elmore's restrictive covenant and to enjoin the misappropriation of trade secrets under the Illinois Trade Secrets Act. On the same day, the parties filed an agreed order in which Elmore agreed not to engage in competitive activities with the plaintiffs during the pendency of the preliminary injunction proceedings in the trial court. The circuit court heard evidence on December 16, 21 and 29, 1988. At the hearing on December 21, 1988, the defense made an oral motion to dismiss all three plaintiffs for lack of standing, arguing that none of the plaintiffs established irreparable injury, because none had ade-

quately shown ownership of Elmore's employment agreement containing the restrictive covenant. After going over with counsel the chain of ownership from AMCO to First United I to First United II, the trial court granted the motion as to the Holding Group (Hamer Holding Group, Inc.) and First United I (First United Property Management Company, Inc.) but denied the motion as to First United II (Studio 2, Inc., which pursuant to a name change on December 5, 1988, three days after the complaint was filed, became known as First United Property Management Company, Inc.).[4]

At the close of the final day of hearing evidence, the court found that the restrictive covenant itself was "clear and unambiguous" and reasonable with respect to time and geographical area; however, relying on *Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 451 N.E.2d 1338, the judge held that any special circumstances which would permit enforcement were lacking. Specifically, the court found that the covenant was not ancillary to the sale of Elmore's business, because (1) the acquisition agreement did not list Elmore's employment agreement as an asset, (2) the two agreements were executed at two different times, and (3) the consideration for the covenant was inadequate in that the acquisition agreement assigned a value of only $5,000 to goodwill, an amount less than 1% of the total purchase price.

The court also found the covenant unenforceable as ancillary to an employment agreement, because plaintiff failed to establish a near-permanent relationship with its customers or the existence of trade secrets. The customer relationships were transitory, the court held, because the accounts could be terminated in 30 or 60 days, and the customer list did not constitute a trade secret, because (1) the original list from the Secretary of State was accessible to anyone, and (2) distillation of the list did not require any intensive effort or a considerable expenditure of time and money. Finally, the court found that even if plaintiff had a proprietary interest in the customer list, it was abandoned. Although releasing the information to noncompetitive members of the Holding Group did not amount to abandonment, the easy access to the list by a vast number of individuals destroyed its confidentiality. On December 30, 1988, the trial court denied plaintiff's motion for a preliminary injunction, and on January 6, 1989, plaintiff filed its notice of interlocutory appeal.

---

[4]In using the singular term "plaintiff" throughout this opinion, we are of course referring to plaintiff First United Property Management, Inc. (First United II), the only survivor of defendant's motion to dismiss.

## II. STANDING

█ Elmore contends that the trial court erred in denying his motion to dismiss plaintiff for lack of standing;[5] more particularly, he asserts that plaintiff failed to establish a valid assignment of rights in his employment agreement and therefore failed to show any irreparable injury to a protectable property interest which would entitle it to redress.

A careful review of the record supports plaintiff's claim that as the only plaintiff to survive defendant's motion to dismiss, it is the legal holder as assignee of the agreement and was such at the time the complaint herein was filed. As noted above, the agreement was executed on March 30, 1984, between Elmore as employee and First United I as employer. Paragraph 9B of the agreement states that it "shall be binding upon and shall inure to the benefit of the heirs, executors, assigns, transferees, and successors in interest of the parties, notwithstanding the reorganization, merger, consolidation or change in personnel of Employer." Received in evidence were resolutions adopted by the boards of directors of the Holding Group and First United I on October 28, 1988, wherein the boards "approved, directed and authorized" the sale of certain assets of First United Property Management, Inc. (First United I), and other entities collectively identified as "Sellers" to Studio 2, Inc. (First United II), and other entities collectively identified as "Buyers." Finally, redacted portions of the October 31, 1988, contract of sale received in evidence pointedly identify defendant's employment agreement as one of the assets which "Sellers" agree to transfer and assign to "Buyers." Defendant's arguments notwithstanding, we find that this evidence conclusively establishes a valid assignment of the agreement from First United I to First United II. Accordingly, we hold that First United II has standing to seek enforcement of the agreement and the restrictive covenant contained therein.

## III. STANDARD OF REVIEW

Plaintiff contends that Elmore's covenant not to compete was ancillary to the sale of Elmore's business to First United I and is therefore subject to a less restrictive test for enforcement. However, before entering into a discussion of this issue, we must first determine

---

[5]Elmore properly raises this issue in his appellate brief without cross-appealing. See *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 386-87, 457 N.E.2d 9, 12; *Koeller v. Cook County* (1989), 180 Ill. App. 3d 425, 430-31, 535 N.E.2d 1118, 1121.

the proper scope of our review.

 Classically, the decision to grant or deny preliminary injunctive relief lies within the sound discretion of the trial court, and a reviewing court's role is therefore limited to determining only whether the trial court abused that discretion. (*Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 672, 546 N.E.2d 1059, 1064; *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 279, 476 N.E.2d 1123, 1128-29.) However, elaborating on the standard of review of cases in which a preliminary injunction is sought, our supreme court stated in *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524-25, 440 N.E.2d 117, 120, quoting from *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33, 380 N.E.2d 1106, 1118:

> " 'It is well established that a hearing on a motion for a preliminary injunction does not determine any factual issue. A preliminary injunction is issued to preserve the *status quo* until the trial court may consider the merits of the case. In ruling on a motion for such relief, controverted facts or the merits of the case *are not decided.* In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be kept in *status quo* until the case can be decided on its merits. In sum the only question before us is whether there was a sufficient showing to sustain the order of the trial court.' " (Emphasis in original.)

Confronted with the considerable record before it, however, the court continued as follows:

> "In this case we do not feel limited by the traditional scope of review of an order issuing a preliminary injunction. Although the order in this case purports to be a preliminary injunction and many references are made in the order to the fact that the court is only preserving the *status quo* until there can be a hearing on the merits, this order is, in effect, a decision on the merits of the case. It should be noted that the transcript of the hearing on the motion for the preliminary injunction is in excess of 4,000 pages. Approximately 28 witnesses testified and more than 80 exhibits were introduced. The hearing lasted approximately 15 days." (91 Ill. 2d at 525, 440 N.E.2d at 120.)

Here, although the hearing spanned only three days and took up 370 pages of transcript, only five witnesses testified, and only 17 exhibits were admitted into evidence, we do not believe that the enormity of the record presented on appeal in *Dixon Association* was the determining factor in the court's selection of the standard of review it would employ in reaching its result. To the contrary, the scope of the hearing there was a sufficient indication to the supreme court that the trial court had heard a sufficient amount of evidence to resolve conclusively the factual issues bearing on the merits of the case, and that therefore the trial judge's decision to grant the preliminary injunction was "in effect" a decision on the merits. Relying on *Dixon Association*, this court reached the same conclusion in *Preferred Meal Systems, Inc. v. Guse* (1990), 199 Ill. App. 3d 710.

In the case *sub judice* we note that prior to setting forth his reasons for denying plaintiff's request for preliminary injunctive relief, the judge reminded the plaintiff that its burden was to prove the four elements of a preliminary injunction "by the preponderance of the evidence" and that "regrettably" it had failed to do so. The judge then recited in detail his findings of fact and conclusions of law with respect to each element. As our supreme court stated in *Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386, 483 N.E.2d 1271, 1277, "[t]he purpose of a preliminary injunction is not to determine controverted rights or to decide controverted facts or the merits of the case." (108 Ill. 2d at 386, citing *Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599, 611, 229 N.E.2d 536, 542; see also *Chessick v. Sherman Hospital Association* (1989), 190 Ill. App. 3d 889, 894, 546 N.E.2d 1153, 1156.) In our opinion, the court's use of the "preponderance of the evidence" standard and not only its willingness but its very ability to make explicit findings and conclusions indicate that it felt that it possessed all of the evidence necessary to render, *in effect*, a fully informed decision on the merits. (*Dixon Association*, 91 Ill. 2d 518, 440 N.E.2d 117.) Our scope of review is governed accordingly, and we must now determine whether the decision of the trial court to deny plaintiff injunctive relief contrary to the manifest weight of the evidence or whether the court erred as to the applicable law or both. See *Warrior v. Thompson* (1983), 96 Ill. 2d 1, 15, 449 N.E.2d 53, 59; *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 279, 476 N.E.2d 1123, 1128.

#### IV. THE VALIDITY OF THE RESTRICTIVE COVENANT

■■ ■ It is well settled that a party seeking to preserve the status quo indefinitely by means of a permanent injunction must show

that it possesses a clear, protectable interest for which there is no adequate remedy at law and that irreparable injury will result if the relief is not granted. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386, 388, 483 N.E.2d 1271, 1277, 1278; *Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 1010, 549 N.E.2d 793, 795; *American National Bank & Trust Co. v. Carroll* (1984), 122 Ill. App. 3d 868, 881, 462 N.E.2d 586, 595.) The burden of proof is heavier for obtaining permanent, as compared to preliminary, injunctive relief. (*Buzz Barton & Associates*, 108 Ill. 2d at 386, 483 N.E.2d at 1277; *Shapiro*, 192 Ill. App. 3d at 1010, 549 N.E.2d at 795.) Unless there exist special circumstances warranting protection, a business entity has no protectable interest in its clientele. (*Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 727-28, 451 N.E.2d 1338, 1345-46.) In the case of covenants not to compete, special circumstances may exist on two separate planes, distinguishable by the type of agreement in which the covenant is anchored. If the covenant is ancillary to the sale of a business by the covenantor to the covenantee, then all the covenantee must show is that the restriction is reasonable as to time, geographical area and scope of prohibited business activity. If, however, the covenant is ancillary only to an employment agreement, the covenantee must show additional special circumstances, such as a near-permanent relationship with his employer's customers and that but for his association with the employer, the former employee would not have had contact with the customers (*PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 1057, 522 N.E.2d 1333, 1339) or the existence of customer lists, trade secrets or other confidential information (*Lawter International, Inc.*, 116 Ill. App. 3d at 727, 451 N.E.2d at 1345). Illinois courts have historically distinguished between the two types of covenants, based on the unique interest which each seeks to protect. Whereas a covenant ancillary to an employment contract shields the employer from the possibility of losing his clientele to an employee who appropriates propriety customer information for his own benefit, and also shields him from the possibility of losing customers with whom he enjoys a near-permanent relationship, a covenant ancillary to the sale of a business ensures the buyer that the former owner will not walk away from the sale with the company's customers and goodwill, leaving the buyer with an acquisition that turns out to be only chimerical. (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 767, 424 N.E.2d 719, 726; *O'Sullivan v. Conrad* (1976), 44 Ill. App. 3d 752, 755, 358 N.E.2d 926, 930.) "[I]n the sale of a business the interest to be protected is the value of the goodwill that is purchased. In protecting the goodwill

sold, the courts consider the fact that the bargaining position is not uneven, as it is generally in an employer/employee relationship, and that the courts are less likely to declare the sale of a business post-employment restraint invalid." *Stamatakis Industries, Inc. v. King* (1987), 165 Ill. App. 3d 879, 888, 520 N.E.2d 770, 776, citing *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 447 N.E.2d 35; *Russell v. Jim Russell Supply, Inc.* (1990), 200 Ill. App. 3d 855.

 Although Illinois courts have not concretely delineated a test for determining whether a restrictive covenant is ancillary to the sale of a business, the few decisions dealing with this precise issue have considered facts bearing on the intent of the parties to protect the integrity of a sale. (See *Boyar-Schultz Corp. v. Tomasek* (1981), 94 Ill. App. 3d 320, 418 N.E.2d 911; *O'Sullivan*, 44 Ill. App. 3d 752, 358 N.E.2d 926.) In the present case, the acquisition agreement between AMCO and First United I explicitly required the execution and delivery of Elmore's employment agreement, containing the covenant not to compete, on or before the date of closing as a "Condition[] Precedent to Obligations of the Parties." Another provision in the acquisition agreement identified the employment agreement as a necessary closing document. Finally, the acquisition agreement incorporated by reference all exhibits and attachments referred to in that document and provided that all agreements executed by the parties in connection with the acquisition agreement would constitute the entire agreement. One of the attached exhibits was the yet unexecuted employment agreement.

The very fact that the execution and delivery of Elmore's employment agreement were a condition precedent to the sale of AMCO underscores the supreme importance of the agreement: unless Elmore agreed to work for First United I under the terms of the agreement, it would not proceed with the sale. Thus, it is clear from plaintiff's position that it deemed Elmore's services an indispensable asset. Not only did First United I seek to secure those services, but it also sought to ensure that once Elmore terminated his employment, he would not use his well-established customer contacts and expertise to make First United I's acquisition an illusory one. In view of these factors, the circumstance that the acquisition agreement did not identify the employment agreement as an asset becomes an unimpressive one, for the transaction as a whole is profoundly charged with the singular importance attached to the covenant by its signatories.

Consequently, we cannot agree with the circuit court's conclusion that the disproportionately small consideration signified in the agreement as goodwill precludes the characterization of the restrictive cov-

enant as being ancillary to the sale of AMCO. Whether $5,000 or $500,000, and whether or not there be a tax advantage to account for it, as long as it is bargained for, the amount the parties assign to a particular asset constitutes legally adequate consideration. (See Restatement (Second) of Contracts §§71, 79, comment *c*, at 201 (1981) ("To the extent that the apportionment of productive energy and product in the economy are left to private action, the parties to transactions are free to fix their own valuations").) And so courts generally will not inquire into the adequacy of consideration (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 356 N.E.2d 67), nor, in this case, will we, especially in view of the fact that Elmore was not a novitiate in the business world and was doubtless fully aware of the nature of the transaction into which he was entering.

■ Having determined that Elmore's restrictive covenant was ancillary to the sale of a business, we must next consider whether the covenant was a reasonable restriction on trade. The inquiry into reasonableness is composed of three parts: the restriction must not be greater than necessary to protect the buyer, oppressive to the seller or injurious to the general public. (*Russell v. Jim Russell Supply, Inc.* (1990), 200 Ill. App. 3d 855, 867; *Boyar-Schulz Corp.*, 94 Ill. App. 3d at 323, 418 N.E.2d at 913; *O'Sullivan*, 44 Ill. App. 3d at 756, 358 N.E.2d at 929.) The circuit court in this case found that the restriction in the covenant for a 75-mile radius for a period of three years was entirely reasonable in terms of geographical area and duration, and we find no reason to disagree.

■ However, Elmore argues that the covenant is unduly broad in that it provides that he may not "in any manner engage in a business competing with the business of Employer anywhere in the Restricted Area," but fails to describe the nature and scope of that business. Although the enforceability of a restrictive covenant is a question of law which depends on the reasonableness of its terms, such a determination depends on the unique circumstances of each case. (*Glass Specialty Co. v. Litwiller* (1986), 147 Ill. App. 3d 653, 498 N.E.2d 876.) The parties in the instant case argued the question of the reasonableness of the scope of restricted activity in the trial court, but the judge did not resolve the issue in light of his ruling that plaintiff could not establish a protectable interest in the covenant not to compete. Nor did the court reach the issue of the nature and scope of the business in which Elmore may not engage, a factual question intimately connected to the enforceability of the restraint. As a reviewing court, we may not pass upon these issues, the resolution of which rests in the first instance with the trier of fact. But we do address the related le-

gal inquiry as to the time frame to which the parties were referring in the clause "the business of Employer." The trial court found the terms of the employment agreement to be clear and unambiguous. We agree. A plain reading of the covenant establishes that the parties intended that Elmore be restricted from engaging in whatever business First United I was conducting at the time he terminated his employment with the company. (*Reynolds v. Coleman* (1988), 173 Ill. App. 3d 585, 527 N.E.2d 895 (clear and unambiguous terms shall be given their natural and ordinary meanings), *appeal denied* (1988), 123 Ill. 2d 566, 535 N.E.2d 410); for to read it otherwise, one would be obliged to add "as the said business existed at the time Employer acquired it" or words to that effect and thereby do violence to the plain meaning of the restriction (*Michigan Avenue National Bank v. Evans, Inc.* (1988), 176 Ill. App. 3d 1047, 531 N.E.2d 872 (reformation proper only on showing of mutual mistake)). Having held above that plaintiff possesses a protectable interest in the noncompetition agreement as a matter of law, we remand the cause to the trial court for a determination based on the record of (1) the nature and scope of plaintiff's business as of the time that Elmore left his employment and, assuming that the record contains sufficient evidence upon which the trial court can resolve that issue, (2) whether the restraint on Elmore's activity in that business would be a reasonable one.

### V. ILLINOIS TRADE SECRETS ACT

■ We turn next to plaintiff's contention that the customer list is a trade secret warranting protection under the Illinois Trade Secrets Act (Act) (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*). Section 2 of the Act provides in pertinent part as follows:

"(d) 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1989, ch. 140, par. 352(d).

Section 3 provides in part:

"(a) Actual or threatened misappropriation may be enjoined." Ill. Rev. Stat. 1989, ch. 140, par. 353(a).

Plaintiff maintains that its customer list meets the three-part definition of "trade secret" under the Act. It argues that (1) the Act expressly provides that "a list of actual or potential customers" can be a trade secret; (2) the uncontroverted testimony of Maute established that the customer list had economic value from its not being generally known to persons who could obtain economic value from its use or disclosure; and (3) Maute's testimony further established that both First United I and First United II made efforts to protect the confidentiality and secrecy of the customer list.

Interpreting the new Illinois Trade Secrets Act in the recent case of *Service Centers of Chicago, Inc. v. Minogue* (1989), 180 Ill. App. 3d 447, 453, 535 N.E.2d 1132, 1136, this court held that "[t]he focus of both the common law and the Act is on the secrecy of the information sought to be protected." In *Service Centers,* the court found that a pricing formula for the storage of medical records did not meet the statutory criteria for secrecy, because the formula was "within the realm of general skills and knowledge" in the medical records storage industry. (180 Ill. App. 3d at 454-55, 535 N.E.2d at 1137.) Furthermore, there was no evidence in the record reflecting the amount of time, expense and effort expended in compiling survey questions for determining customer requirements. 180 Ill. App. 3d at 454, 535 N.E.2d at 1136.

■ In the present case, although Maute testified that distilling the prime customer list from the Secretary of State's list cost approximately $60,000, we agree with the circuit court that anyone having access to the Secretary's information could have easily duplicated the same process of "distillation." Anyone equipped with a public telephone directory could have collected the contact information for board members which plaintiff seeks to protect.

Plaintiff points out that, by eliminating from the definition of "trade secret" the qualifying clause "not being readily ascertainable by proper means by others," the drafters of the Act intended to eliminate the defense available under the Uniform Act that the information could be developed legally through other means. (See Jager, *Illinois Returns to the Mainstream of Trade-Secret Protection,* Chi. B. Rec., October 1988, at 18, 20.) Plaintiff's argument is unpersuasive, however, because the key to "secrecy" is the ease with which information can be developed through other proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret. Conversely, information which can be duplicated only by an expensive and time-consuming method of reverse engineering, for instance, could be secret, and the ability to

duplicate it would not constitute a defense. (*Cf. ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 96, 273 N.E.2d 393, 396 (although ability to lawfully duplicate a design by reverse engineering was not a defense, the time it would take to independently duplicate the design was an appropriate length of time for injunction).) For the foregoing reasons, we agree with the trial court and affirm its holding that since plaintiff's customer list could be easily duplicated, it does not qualify as a "trade secret" under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1989, ch. 140, par. 352(d)).

## VI. CONCLUSION

As we have determined above, plaintiff established a protectable interest in the goodwill of the business it acquired from Elmore. To obtain injunctive relief, plaintiff must further show the absence of an adequate remedy at law and irreparable injury if the relief is not granted.

No adequate remedy at law exists where there is evidence that the plaintiff will be subject to constant and frequent transgressions of a continuing nature. (*Lawter International, Inc. v. Carroll* (1983), 116 Ill. App. 3d 717, 731, 451 N.E.2d 1338, 1348.) Irreparable injury exists where it is difficult to assign pecuniary value to the injury suffered. (116 Ill. App. 3d at 731, 451 N.E.2d at 1348.) We find that plaintiff meets both of these requirements as well.

Accordingly, with respect to the parties' agreement not to compete, we hold that the trial court's determination that plaintiff failed to establish a protectable interest in the restrictive covenant was against the manifest weight of the evidence and contrary to law; we affirm its finding that the covenant is reasonable with respect to geographical scope and duration; and we remand for a determination based on the record of the nature and scope of plaintiff's business as of the time Elmore terminated his employment and, in light of such determination, the reasonableness of the covenant as a restraint on trade. With respect to plaintiff's customer list, we affirm the trial court's finding that the list does not meet the criteria of a trade secret warranting protection under the Illinois Trade Secrets Act.

Affirmed in part; reversed in part and remanded for further proceedings consistent with this opinion.

DiVITO, P.J., and BILANDIC, J., concur.