CENTRAL IMPORTS, INC., Plaintiff-Appellee, v. DORTMUNDER AC-TIEN-BRAUEREI AG, Defendant-Appellant.

First District (2nd Division)   No. 1—89—3050

Opinion filed May 7, 1991.—Rehearing denied June 18, 1991.

Stephen C. Carlson and John A. Heller, both of Sidley & Austin, of Chicago, for appellant.

Eugene E. Gozdecki and Howard A. Voeks, both of Gozdecki & Zido, of Chicago, for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff, Central Imports, a beer distributor, brought an action for wrongful termination of its distributorship, basing it on common law contract theories and the Illinois Beer Industry Fair Dealing

Act (Ill. Rev. Stat. 1987, ch. 43, par. 301 *et seq.*) (the Act). After plaintiff was granted a preliminary injunction enjoining defendant Dortmunder Actien-Brauerei AG (DAB or brewery) from terminating plaintiff as a distributor, DAB took an interlocutory appeal.

DAB is a German brewery which manufactures DAB brand beer. Beginning in the early 1950's, it distributed beer in Illinois and surrounding States through a succession of wholesale companies owned and operated by Joseph Gies. In 1978, Gies, along with Arnold Holan, formed a wholesale company called Charter Imports, Inc., which continued to market the DAB brand in a nine-State Midwest region.

In 1985, the Heileman Brewery succeeded Charter Imports as distributor of Hacker Pschorr beer, leaving Charter Imports with DAB beer as its only major brand. Gies and Holan thereupon decided that it was no longer economically feasible for them to remain in the market because, in their opinion, a company with only one import brand would find it very difficult to survive.

In the summer of 1986, Gies and Holan approached another beer distributor, then known as Central Chicago Distributing Company and now known as Central Distributing, Inc., regarding the possible sale to it of Charter Imports. An agreement was reached to sell certain assets of Charter Imports to Central Distributing, including the right to distribute DAB beer, but the transferring of the right was conditioned upon the approval of the brewery.

Gies and Holan sent a letter to the brewery on September 5, 1986, advising it that Charter Imports would cease doing business on October 30, 1986. On September 14, 1986, as a result of that letter, a meeting took place between Gies and Holan, three representatives of Central Distributing, and representatives of the brewery. DAB and Central Distributing determined, at this time, to establish a separate company, Central Imports, Inc., to handle the DAB brand. The brewery thereafter sent a letter dated October 22, 1986, to Central Imports, appointing it as the new distributor for DAB beer for a trial period running from November 1, 1986, through December 31, 1987, with a provision for future negotiation of a "final agreement."

Although the contemplated "final agreement" never materialized, on November 18, 1988, DAB shipped $63,210.75 worth of beer to Central Imports under invoices which stated that payment was due on January 18, 1989. On January 6, 1989, Tarlock Chhokar, who did Central Imports' bookkeeping, prepared a check made payable to DAB for the full amount due and had it signed by Bruce

Ruzgis, the president of Central Imports and one of its owners, and Kenneth Hartmann, who was the president of Central Chicago Distributing and one of the principals of Central Imports. However, before it was mailed, the check was voided on the instruction of Donna Spagnolla, Central Imports' controller, because, as she testified, "Central Imports was waiting for some receivable money to come in."

On January 24, 1989, Frederick Hess, Jr., the president of DAB, called Chhokar and told him that the brewery was "upset" that it had not received payment when it was due. Hess Jr. continued to call Chhokar through the remainder of January and into February of 1989 regarding payment, but without any favorable result. Chhokar acknowledged that in February 1989, "one of the Fred Hesses" called him and stated that "payments were overdue, and they want their money."

On March 8, 1989, Hess Jr. called Chhokar again regarding payment and was told that the check had been made out and that he would look into its progress. Hess Jr. made a contemporaneous note of this phone call on a "faxed" communication he had received from the brewery. On March 13, 1989, Hess Jr. again called Chhokar regarding payment and Chhokar informed him that the check was in the mail, but the check was never received.

On March 17, 1989, Hartmann called Frederick Hess III, the secretary-treasurer of DAB, and told him that DAB should stop dealing with Chhokar regarding the past-due invoices and to deal instead with Timothy Mirkiewicz, the general manager of Central Imports. Hess III testified that when, on March 20, 1989, he called Mirkiewicz and told him that $63,210.76 was "well overdue," Mirkewicz stated that he "didn't have a good knowledge of the complete situation" and asked if he could call "back the next day to respond to that." The next day, Mirkewicz called Hess III and, after telling him that he understood that the payment was "long overdue," informed him that Central Imports' controller had suggested paying the bill in four equal installments over the following four weeks. Hess III testified that he informed Mirkiewicz during this conversation that stretching out the payments in the manner suggested was "totally unacceptable" and that he demanded full payment. Mirkiewicz, however, testified that Hess III stated in response to the suggestion of an extended payment schedule, "If that's what you have to do, that's what you have to do. Any payment is better than no payment." Mirkiewicz also stated that he

took part in several other conversations with the Hesses regarding the $63,210.75.

On March 23, 1989, Hess III again called Mirkiewicz and was told that not even a partial payment had been sent but that such a payment would be mailed the next day. Although Central Imports alleges in its brief that it sent its first payment of slightly more than $15,000 by check on March 27, 1989, the record shows that when Hess called Mirkiewicz on March 28 and told him that no check had been received, Mirkiewicz stated that no check had been sent out, but that Central Imports would send it immediately.

Mirkiewicz testified that in these conversations, Hess III merely "inquired" about the status of the payment for the outstanding invoice. Ruzgis stated that he had had several conversations with the Hesses during the period from January 1989 through April 2, 1989, but that in none of those conversations did the Hesses ever indicate that Central Imports was late in its payments, nor did they ever request payment from him.

On March 28, 1989, the brewery informed Hess Jr. that it had decided to terminate Central Imports as a distributor and sent him a draft of a proposed letter addressed to Central Imports informing it of its decision. Hess Jr. returned the letter to the brewery and advised it that it should use March 28, 1989, as the date of the letter, since that was the date it had made the decision to terminate. Hess Jr. also recommended that the brewery send the letter to Central Imports by way of regular mail, the slowest route, in order to give Hess Jr. and his son additional time in which to try to collect payment. Hess Jr. had surmised that Central Imports would refuse to pay once it learned that it had been terminated.

On April 3, 1989, Hess III made a trip to Central Imports' office in Chicago to try to collect the $63,210.75. Mirkiewicz met Hess III at the airport and gave him a check for $15,800 and informed him that another partial payment had been sent to his office. Hess III called his office, learned that a check for $15,800 had arrived on March 31, 1989, and later met with Ruzgis and Hartmann at Central Imports' office. Ruzgis testified that he and Hartmann learned for the first time at this meeting that payment was past due, and arranged for Hess III to receive two more checks, which paid the balance of the account in full. The next day, Hartmann replaced these two checks, which were post-dated April 10 and April 17, 1989, with a single check dated April 4, 1989. On April 7, 1989, Central Imports received the termination letter from the brewery.

Central Imports filed its complaint on May 4, 1989, naming the brewery, the chairman of its board of directors, DAB Importers, which coordinates the importation of DAB beer into the United States, and one of Central Imports' subdistributors as defendants. On May 9, 1989, a temporary restraining order (TRO) was issued on plaintiff's motion, and was extended several times. A hearing on plaintiff's motion for preliminary injunction against DAB Importers began on June 29, 1989, and although that motion was denied, the TRO was kept in place against the brewery.

In August 1989, plaintiff filed its first amended complaint, which named the brewery, the chairman of its board of directors, DAB Importers and the Hesses as defendants. Beginning on October 5, the circuit court conducted a hearing on Central Imports' request for a preliminary injunction against the brewery, and on October 20, 1989, the court entered an order enjoining it from terminating plaintiff as its exclusive importer and master distributor for a nine-State Midwest region and from providing DAB products to anyone other than plaintiff for distribution in the Midwest region. The brewery filed this interlocutory appeal on October 31, 1989.

■■ The brewery appeals the trial court's order granting a preliminary injunction, alleging that there was good cause to terminate Central Imports as a distributor. It is well established in Illinois that a preliminary injunction is an extraordinary remedy which should be granted only with the utmost care. (*Hannan v. Watt* (1986), 147 Ill. App. 3d 456, 461.) Classically, the decision to grant or deny preliminary injunctive relief lies within the sound discretion of the trial court, and a reviewing court's role is therefore limited to determining only whether the trial court abused its discretion. (*Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1005; *Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 672.) In reviewing the discretion exercised by the trial court, an appellate court may decide only whether the petitioner has established the following four elements: (1) the existence of a protectible right; (2) irreparable harm should the court not issue the injunction; (3) the lack of an adequate remedy at law; and (4) a likelihood of success on the merits. *Hopf v. Topcorp, Inc.* (1988), 170 Ill. App. 3d 85, 90.

For the purposes of our review, it is necessary to determine only whether Central Imports was likely to succeed on the merits of its case, and this would depend upon whether the Beer Industry Fair Dealing Act (Act) (Ill. Rev. Stat. 1987, ch. 43, par. 303(3)(A))

provides adequate grounds for its termination of Central Imports' distributorship. Section 3 provides in pertinent part:

"§3. Termination and Notice of Cancellation.

(1) Except as provided in subsection (3) of this Section, and except as agreed upon by the parties, no brewer or beer wholesaler may cancel, fail to renew, or otherwise terminate an agreement unless the brewer or wholesaler furnishes prior notification to the affected party in accordance with subsection (2).

(2) The notification required *** shall be in writing and sent to the affected party by certified mail not less than 60 days before the date on which the agreement will be cancelled, not renewed, or otherwise terminated. Such notification shall contain (a) a statement of intention to cancel, failure to renew, or otherwise terminate an agreement, (b) a statement of reasons therefore, and (c) the date on which such action shall take effect.

(3) A brewer may cancel, fail to renew, or otherwise terminate an agreement without furnishing any prior notification for any of the following reasons:

(A) Wholesaler's failure to pay any account when due and upon demand by the brewer for such payment, in accordance with agreed payment terms." (Ill. Rev. Stat. 1987, ch. 43, par. 303.)

The trial judge found that "there were several demands" made on Central Imports and "that the payment performance was poor and late payments have been made." The judge went on to conclude, however, that although the brewery had made several demands, the Act provides that proper notice of the manufacturer's intention to terminate the distributor must be in writing and that the manufacturer must provide the distributor with "a reasonable opportunity to pay" after receiving such notice. Applying this interpretation of the statute, the court determined that the brewery did not make a demand for payment until it sent the termination letter to Central Imports, which did not have an opportunity to respond to the letter before being terminated.

DAB complains that the trial court's interpretation that the statute requires written notice is inconsistent with the plain meaning of the statute and that it made several demands, beginning on January 24, 1989, when Hess Jr. called Chhokar and requested payment. Accordingly, it argues that Central Imports' April 4, 1989, payment was not payment upon demand. Central Imports responds

that the legislative intent of the statute recognizes commercial reasonableness and good faith, that the requirement of written notice of termination is reasonable, and that it would be unfair to terminate a distributorship in which $2 million of purchases had been made because the distributor is late in making a $63,000 payment. This overlooks, however, the trial judge's specific findings that several demands for payment had been made on Central Imports, that its "payment performance was poor," and that it had been guilty of late payments.

■■ Neither Central Imports nor the trial court has pointed to anything in the legislative history of the Act indicating that the legislature considered it unfair for a brewery to terminate a distributor when it ignores oral requests for payment for over two months. On the contrary, as noted above, the statute clearly and unmistakably provides that a brewer or wholesaler need not previously notify "the affected party" in any way of a cancellation or failure to renew an agreement in cases where the distributor fails "to pay any account when due and upon demand by the brewer for such payment, in accordance with agreed payment terms." We conclude, therefore, that the Beer Industry Fair Dealing Act does not require written notice or any warning that termination will result from a failure to make payment on demand. Accordingly, we hold that the Act allowed the brewery to terminate Central Imports without prior notice thereof for failure to pay for the November 8, 1988, shipment when it was due and upon demand being made therefor.

■■ Plaintiff Central Imports also contends that Chhokar was not its bookkeeper, but was Central Distributing's bookkeeper, who also wrote checks for it, and DAB should have contacted a principal of Central Imports, instead of Chhokar. However, the evidence is undisputed that Hartmann told Hess III and Hess Jr. that they should direct all problems of payment to Chhokar. Because there is no support in the record for Central Imports' allegations, we hold that the trial court erred in issuing a preliminary injunction against DAB. Accordingly, the judgment of the circuit court is hereby reversed.

Reversed.

HARTMAN and DiVITO, JJ., concur.