**BUSINESS RECORDS CORPORATION, a Texas Corporation, Plaintiff–Appellee,**

v.

**Carl D. LUETH, Defendant–Appellant.**

**No. 92–1429.**

United States Court of Appeals, Seventh Circuit.

Argued July 7, 1992.

Decided Dec. 14, 1992.

Gregory S. Gallopoulos (argued), Bradford P. Lyerla, Patricia A. Bronte, Jenner & Block, Chicago, IL, for plaintiff-appellee.

Eric N. Macey (argued), P. Andrew Fleming, Michael J. Kennedy, Novack & Macey, Chicago, IL, Randall Ray, Sebat, Swanson, Banks, Garman & Townsley, Danville, IL, for defendant-appellant.

Before CUDAHY, COFFEY, and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

As a public servant, many years ago, Carl Lueth served as deputy chief of the Kankakee County Clerk's Office, Clerk of Kankakee Township and Treasurer of Kankakee County. Over the course of these earlier years Lueth became an expert on state election laws and mastered the ins and outs of election administration. In 1970 Lueth moved to the private sector, bringing with him his expertise and the contacts he had made among Illinois election administrators. Lueth became a prominent success with Illinois Office Supply Company (IOS), where he served as a vice-president who sold election equipment to state and local governments. Hard work keyed Lueth's success: he participated in all the meetings attended by county officials responsible for running elections, he kept his contacts alive by regular visits to their offices and he personally assisted officials with the administration of elections. Lueth had contact with virtually every county official in the state of Illinois. The Illinois legislature acknowledged Lueth's success by appointing him to the statewide committee charged with advising the legislature on revisions to the state's election laws.

In 1980 Richard McKay convinced Lueth to come work for him. McKay owned Frank Thornber Company, an IOS competitor. Shortly thereafter Thornber acquired IOS, thus consolidating 87 of the 111 Illinois counties and election commissions as customers of Thornber. Not long after Lueth joined Thornber, a rival company, Fidlar & Chambers, began to make inroads into Thornber's market share. By 1985 Thornber's power in the election equipment market had decreased markedly. At that time Business Records Election Systems

purchased Thornber. (Business Records Election Systems is now Business Records Corporation (BRC).) BRC is a Texas corporation that operates nationwide. In the Illinois market BRC deals only with local governments. Thornber and BRC signed an Asset Purchase Agreement, which was dated March 22, 1985. The Agreement included a covenant by Thornber to BRC that Lueth, among others, would sign a noncompetition agreement; the Agreement also made Lueth's signing of the noncompetition agreement a condition precedent to BRC's purchase of Thornber. The covenant contained in the Agreement was designed to be in effect until "the later of (i) the third anniversary of the date of this Agreement or (ii) the second anniversary of the Employee's termination as an employee of [BRC]." Lueth signed the agreement, dated March 22, 1985, and received as consideration an option to purchase 3750 shares of BRC's parent's common stock.

Lueth became president of Thornber after the sale, and when BRC stopped using the name Thornber he was dubbed a vice-president of BRC. In 1989 Lueth's responsibilities were reduced to that of manager of sales in Illinois, excluding Cook County. In 1990 he became a BRC sales representative for sales and service of election equipment in central Illinois. Nothing indicates that these moves were demotions. In early 1991 Lueth began talking with Richard McKay about the two of them reuniting. McKay had just started Governmental Business Systems (GBS), an election equipment sales company established to compete with BRC. Lueth signed a written proposal for employment with McKay and GBS on March 23, 1991, but he did not tell BRC about his arrangement with GBS until April 19, 1991. Since Lueth began working for GBS he has contacted election officials throughout the state from Aurora to Massac.

■ BRC sued Lueth to enjoin him from acting in violation of the noncompetition agreement. BRC brought the suit in federal court under the diversity jurisdiction, 28 U.S.C. § 1332(a)(1), and the law of Illinois governs. The district court granted the injunction based on its reading of state law; therefore, this court must review de novo the district court's legal conclusions. *Salve Regina College v. Russell*, ⸺ U.S. ⸺, ⸺, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). To the extent that the legal determinations turn on questions of fact—for example whether a restrictive covenant was reasonable in scope, *see* Williston on Contracts § 1638, at 108 (3d ed. 1972)—the court must accept the district court's findings unless those findings are clearly erroneous. *Mucha v. King*, 792 F.2d 602, 605–06 (7th Cir.1986); Fed. R.Civ.P. 52(a).

■ The threshold issue in this case is whether the noncompetition agreement is properly characterized as a "covenant to a purchaser," which is a covenant made ancillary to the sale of a business, or a "covenant to an employer," which is a covenant made ancillary to an employment contract. The distinction is crucial because "courts are less likely to declare [a covenant to a purchaser] invalid." *Hamer Holding Group, Inc. v. Elmore*, 202 Ill.App.3d 994, 1008, 148 Ill.Dec. 310, 319, 560 N.E.2d 907, 916 (1990); Restatement (Second) of Contracts § 188 cmt. b (1979). The distinction is rooted in the differences "in the nature of the interests sought to be protected in the case of an employer on the one hand [and] the case of a buyer on the other." *O'Sullivan v. Conrad*, 44 Ill.App.3d 752, 755, 3 Ill.Dec. 383, 386, 358 N.E.2d 926, 929 (1976). A covenant to a purchaser serves to preserve the value of what the purchaser has bought, while a covenant to an employer serves to protect information or relationships that the employee might acquire by virtue of the fact that the employer hired him. Restatement (Second) of Contracts § 188 cmt. b; Blake, *Employee Agreements Not to Compete*, 73 Harv. L.Rev. 625, 646–47 (1960). The purchaser of a business has an interest in preserving the goodwill that he purchases (which may include clientele in some cases), particularly in a service industry. Note, *Validity of Covenants Not to Compete: Common Law Rules and Illinois Law*, 1978 Ill.L.Forum 249, 253. A covenant to a purchaser also poses a lesser threat of restraining

trade or competition because the seller has bargaining power that a typical incoming at-will employee would not be expected to have. Indeed, covenants to a purchaser were the first restrictive covenants allowed at common law, in recognition of the catalytic role such covenants play in promoting the transferability of property, thus enhancing trade and competition. *See Mitchel v. Reynolds,* 1 P.Wms. 181, 24 Eng. Rep. 347 (K.B. 1711); *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1083 (7th Cir.1986).

■ Though there is no established litany of requirements, Illinois courts consider several factors when determining if a restrictive covenant is to a purchaser or to an employer. The courts generally consider "facts bearing on the intent of the parties to protect the integrity of the sale." *Hamer Holding,* 202 Ill.App.3d at 1008, 148 Ill.Dec. at 319, 560 N.E.2d at 916. Such facts may include: whether the covenant was a condition precedent to the sale, *id.;* whether the covenant was incorporated into the sale agreement, *id.;* and the time that the parties signed the covenant in relation to the time they signed the sales agreement, *O'Sullivan,* 44 Ill.App.3d at 756, 3 Ill.Dec. at 386, 358 N.E.2d at 929.

■ Lueth argues that he was not a seller or owner of Thornber so he should not be subject to the readier recognition courts give to covenants to purchasers. This argument might prevail if Lueth executed the covenant as a result of circumstances apart from the dealings between McKay and BRC. But that is not what happened. The covenant to the purchaser that Lueth signed was part of the sales agreement. It was placed in the agreement in part at least to prevent Thornber from selling its business to BRC and then letting the employees "walk away from the sale with the company's customers and goodwill, leaving [the purchaser] with an acquisition that turns out to be only chimerical." *Hamer Holding,* 202 Ill.App.3d at 1008, 148 Ill.Dec. at 319, 560 N.E.2d at 916. When the value of a company depends on the goodwill commanded by its top employees, those employees may make an enforceable covenant not to compete with the purchaser. *See* Restatement (Second) of Contracts § 188 cmt. f & illus. 5. Lueth entered the covenant because he thought that it would help Thornber to grow in competitiveness and open new opportunities for the company. BRC wanted Lueth as part of the deal: it made his signature on the noncompetition agreement a condition precedent to its purchase of Thornber; it incorporated the noncompetition agreement as part of the sales agreement; the noncompetition agreement and the sales agreement were executed simultaneously; and BRC gave Lueth 3750 shares of its parent's common stock. At the bargaining table Lueth accepted the restraints voluntarily, enthusiastically and for valuable consideration.

■ The covenant here can be characterized as a covenant to a purchaser. There is one twist, however. The agreement called for the covenant to expire on the later of three years from the date of purchase or two years from the date of quitting. The aspect of the covenant that relates to the period after the date of purchase obviously relates to protection of the buyer. On the other hand, the part that bars competition for two years after the date of quitting sounds more like a provision to protect an employer from a renegade employee than one to protect a purchaser from an unscrupulous seller. The covenant for two years beyond the date of quitting is therefore considerably more difficult to justify than the covenant for three years beyond the sale. Consider if Lueth had worked for BRC for twenty years before quitting. According to the covenant he would not be able to compete against BRC for two years past his quitting date. But by that time BRC's need to protect its purchase would be long gone, and it would be procrustean to say that the covenant was one for the protection of a purchaser as such.

If BRC had sought to enforce the covenant in those circumstances a court might well have held it unreasonable to do so. In the case before us, however, Lueth worked only six years for BRC, so we need only decide if the restriction was reasonable giv-

en the present facts. It is true that BRC did not teach Lueth any special techniques that it needed to protect, it had no trade secrets or classified information that it wanted to preserve and Lueth brought clients to BRC; BRC did not bring clients to Lueth. The district court, however, found that BRC did make a significant investment in Lueth beyond the consideration in the purchase agreement. The court's finding that BRC built on the goodwill it purchased and invested in preserving Lueth's loyalty was not clear error. This provides a solid basis for a determination of reasonableness.

■ To support the reasonableness of the covenants, BRC must also show "that the restriction is reasonable as to time, geographical area and scope of prohibited business activity." *Hamer Holding*, 202 Ill.App.3d at 1007, 148 Ill.Dec. at 318, 560 N.E.2d at 915. Courts will also consider, under the general rubric of "public policy," whether enforcement of the covenant would be "oppressive to the seller or injurious to the interests of the general public." *O'Sullivan*, 44 Ill.App.3d at 756, 3 Ill.Dec. at 386, 358 N.E.2d at 929. Given the deference that we must give to the court's findings of fact bearing on these questions, we believe that the restrictions are reasonable.

■ Lueth argues that the covenant's geographical restraint is unreasonable because it essentially bars him from working anywhere. But, as the district court recognized, the covenant bars him from competing with BRC "in any state in which Employee worked on a full-time basis during the time of Employee's employment with [BRC]." The court read "any state" to mean Illinois. And even though Lueth argues that the court erred by reading the covenant to be limited to Illinois, the fact that the court so held and its injunction so reads now confines the geographic restraint to Illinois. *Wyatt v. Dishong*, 127 Ill.App.3d 716, 719, 83 Ill.Dec. 1, 3, 469 N.E.2d 608, 610 (1984) (reviewing court may look to injunction rather than contract when covenant specifically allows a court to modify its limits). This is a reasonable limit if it covers only the area where

Lueth's employment might put at risk BRC's interests; that is, the restraint is reasonable as long as it is coextensive with the goodwill BRC bought by bringing Lueth to its business. The court found that Lueth's expertise extended throughout the state of Illinois, and that it was Lueth's statewide reputation and the loyalty of his statewide clients that BRC purchased. This was not clearly erroneous. BRC competed with Thornber throughout the state for sales in the market for election equipment. When BRC bought Thornber it also bought a restraint that would keep its top employees (Lueth included) from filching customers that BRC reasonably expected to acquire as part of its deal. Because the restriction did not extend beyond the borders of Illinois—the former forum for the competition between BRC and Thornber—the restriction was reasonable. *See* Restatement (Second) of Contracts § 188 cmt. f.

The court also ruled correctly that the two-year time limitation was reasonable. The reasonableness of the time restraint is linked to the time it would take BRC, should Lueth leave, to make Lueth's goodwill its goodwill. The court linked the time to the time period between statewide elections. This finding was not clearly erroneous.

The noncompetition agreement, properly paraphrased, says that Lueth may not engage directly or indirectly in any business that provides the same services to any person whom Lueth serviced in his various capacities at BRC during the time he worked there. Lueth claims that this is too restrictive a proscription on the scope of his activities because it prevents him from working anywhere in any capacity. Lueth's claim that the covenant bars him from working anywhere is incorrect, as our discussion has indicated in making clear that Lueth is only restricted from working in Illinois. The remaining part of Lueth's argument suffers from his total reliance on cases where certain restrictions in covenants to an employer were found unreasonable. These cases are of limited authority in the case before us. *O'Sullivan*, 44 Ill. App.3d at 755, 3 Ill.Dec. at 386, 358 N.E.2d at 929. Lueth is not allowed to *compete*

*against* BRC in the same capacity that he *performed for* BRC. Because he sold election equipment and land indexing systems for BRC, he cannot sell election equipment or land indexing systems directly or indirectly to state officials in Illinois. This is a reasonable restraint on Lueth's activities, drawn to protect BRC's legitimate interest.

As a final matter Lueth claims that the agreement is overly broad because 1) it prevents him from dealing with customers who were not BRC customers when he left BRC, and 2) it prevents him from competing in businesses other than the sale of election equipment. Lueth's first claim has no merit. If this were a covenant to an employer, courts would frown upon an across-the-board limitation on Lueth's right to ply his trade. But Lueth received valuable consideration in exchange for his promise not to compete with BRC. Because BRC purchased from Lueth his two-year forbearance from competition in the election-equipment market, the identity of those with whom he may not deal is not material. We have already discussed the reasonableness of the restraint in relation to his activities. And the district court did not commit clear error in finding that there would be no harm to the public in so restricting Lueth's activities for two years.

AFFIRMED.