### The LOEWEN GROUP INTERNATIONAL, INC., Plaintiff,

v.

### William J. HABERICHTER, Defendant.

#### No. 93 C 7377.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 9, 1996.

---

**390**

Kevin E. White, E. King Poor, Catherine W. Joyce, Winston & Strawn, Chicago, IL, for plaintiff.

Patrick Joseph Fanning, Kathryn M. Reidy, Knight, Hoppe, Fanning & Knight, Ltd., Des Plaines, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Loewen Group International, Inc. ("Loewen") brings this four-count complaint against William J. Haberichter for breach of contract (Count I), breach of a covenant not to compete (Count II), breach of fiduciary duty (Count III), and injunctive relief against future violations of the covenant not to compete (Count IV).[1] Presently before this court is the plaintiff's motion for a preliminary injunction, which for the reasons set forth below we refer to Magistrate Judge Rosemond for an evidentiary hearing.

### I. Background

Loewen is a Delaware corporation involved in, among other things, the ownership and operation of funeral homes and cemeteries. In an Asset Purchase Agreement dated December 5, 1991, Loewen purchased the funeral home business of Donovan and Schaer Funeral Homes, P.C. ("D & S") from its principals Robert E. Schaer, Donald R. Hartman, and Lee J. Schlegal. D & S consisted of two funeral homes: Oehler Funeral Home ("Oehler") in Des Plaines, Illinois, and Lauterburg & Oehler Funeral Home ("L & O") in Arlington Heights, Illinois. In exchange for the purchase price paid by Loewen, D & S and its principals agreed to transfer the businesses to Loewen and refrain from participating in any competing business within fifty miles of either funeral home for a period of ten years. Purchase Agreement ¶ 11.

At the time of the sale, Haberichter was the assistant manager at L & O, and had been employed by D & S for approximately thirty years. Pursuant to the Purchase Agreement, Loewen was obligated to offer continuing employment to Haberichter provided that he entered into a non-competition agreement similar to the one required of the principals of D & S. Purchase Agreement ¶ 12–13. If, however, Haberichter chose not to enter into an employment agreement with Loewen, then the company would not be obligated to provide him with any employment. *Id.* ¶ 13.

On February 11, 1992, the day on which D & S and Loewen closed the sale of D & S, Haberichter signed an Employment Agreement with Loewen for a period of five years.[2] This document stated that Loewen "has agreed to acquire a funeral home business located at Des Plaines, Illinois (the 'Chapel').... [and] agrees to employ [Haberichter] and [Haberichter] agrees to accept employment as the Assistant Manager of Chapel." Employment Agreement at 1. In addition, the employment agreement contained the following covenant not to compete:

Assistant Manager hereby covenants with Company that (except as otherwise specifically permitted herein) from the date hereof until the earlier of ten years from the date of the Closing of the related business purchase agreement ... or three years immediately following the date of termination of employment of or by Assistant Manager, Assistant Manager shall not, directly or indirectly, for his own account, or as a partner, member, employee, advisor

---

1. Although we previously granted summary judgment to Haberichter based on our conclusion that Loewen's suit was preempted by the *Labor Management Relations Act* ("LMRA"), 863 F.Supp. 629 (N.D.Ill.1994), the Court of Appeals for the Seventh Circuit reversed and ordered Loewen's claims reinstated, 65 F.3d 1417 (7th Cir.1995).

2. Although Haberichter signed the agreement on February 11, 1992, his lawyer did not "unconditionally" deliver it to Loewen until two days later. Pl.'s Reply to Motion for Prelim.Inj., Ex. A.

or agent of any partnership or joint venture, or as a trustee, officer, director, shareholder, employee, advisor or agent of any corporation, trust, or other business organization or entity, own, manage, join, participate in, encourage, support, finance, be engaged in, have an interest in, give financial assistance or advice to, permit his name to be used in connection with or be concerned in any way in the ownership, management, operation or control of, or be connected in any manner with any business which is or may be in the funeral, mortuary, crematory, burial, or funeral insurance business (including pre-arrangement or pre-need), or any business related to any of the forgoing, within a 10 mile radius of the present location of Chapel.

Employment Agreement at 5–6, ¶ 19(a). The agreement also provided for Haberichter to be paid $75,000 for this covenant,[3] as well as $52,000 per annum for his services. Employment Agreement at 6, ¶ 19(b); *id.* at 3, ¶ 8.

However, soon after signing the Employment Agreement Haberichter began making plans to set up a competing funeral home. Beginning in late 1992, he started negotiating with the owner of a parcel of real property at 3615 Kirchoff Road in Rolling Meadows, Illinois. Haberichter intended this parcel, which is 7.5 miles from Oehler in Des Plaines and 3 miles from L & O in Arlington Heights,[4] to be the site of his future funeral business. In July 1993, Haberichter's financial consultant prepared a business plan for the defendant's new funeral business, and surreptitiously presented it to several banks in order to obtain financing for the operation. Loewen contends that the defendant also began screening its "pre-need" customers,[5] and using this information to assist him in the preparation of the business. Loewen eventually learned that its employee was planning to start a competitor, and when confronted with this information in November 1993, Haberichter tried to tender his resignation and request his severance benefits. Instead, Loewen refused to permit Haberichter to resign and terminated him for cause effective November 9, 1993. The instant lawsuit was filed on December 9, 1993, seeking compensatory damages and injunctive relief for Haberichter's breach of his employment contract, his covenant not to compete, and his fiduciary duty to Loewen. Loewen maintains that even since the filing of its complaint, Haberichter has continued to breach the covenant not to compete by participating in another funeral business and continuing to develop his competing facility in Rolling Meadows.

We granted summary judgment to Haberichter on August 22, 1994, finding that Loewen's state law claims were preempted by the LMRA. Loewen maintains that after we handed down this decision the defendant began building the "Meadows Funeral Home" at 3615 Kirchoff Road in Rolling Meadows, notwithstanding the fact that Loewen had appealed our ruling. On September 18, 1995, the Court of Appeals for the Seventh Circuit reversed our decision, concluding that Loewen's claims were not preempted. On or about October 13, 1995, Loewen learned that the Meadows Funeral Home was operational, and that it was scheduled to hold a service for one of Loewen's pre-need customers, Ms. Elsa Eck. Loewen subsequently learned of

---

3. Although Haberichter could have chosen to be paid $125,000 over a period of ten years, he elected to receive the one-time lump sum of $75,000 for the covenant.

4. The parties appear to agree on these distances, as well as on the driving distances between the Rolling Meadows property and Loewen's facilities (9.2 miles to Oehler, 4.7 miles to L & O). However, Loewen contends that the covenant runs from both Oehler and L & O, while Haberichter maintains that the language of the agreement only prevents him from competing within ten miles of "the Chapel," which is defined as "a funeral home business in Des Plaines, Illinois." We need not resolve this dispute at this juncture, since regardless of exactly where the restricted area runs, the Rolling Meadows property purchased by Haberichter clearly falls within a ten mile radius of either Oehler or L & O.

5. A potential customer can prearrange and pay for a funeral by purchasing "pre-need" funeral insurance, which many funeral homes sell in order to drum up future customers. Although at the time of purchase the customer designates a funeral home at which to conduct the services, this designation may be changed at any time. According to Loewen, funeral businesses keep their pre-need contracts confidential to ensure future customers.

others who planned to have their funeral arrangements and services performed at Meadows. On November 1, 1995, Loewen filed the instant motion for a preliminary injunction, seeking to prevent Haberichter from operating the Meadows Funeral Home for a three year period.

## II. Motion for Preliminary Injunction

■ A preliminary injunction may be granted if the movant demonstrates "(1) that the case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that the party seeking relief will suffer irreparable harm if the injunction is not granted." *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994) (citing *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir. 1994)). Once the movant satisfies these three threshold requirements, the court then balances the harm to the non-movant if the injunction is granted against the harm to the movant if the injunction is denied. *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994). This balancing is conducted on a sliding scale: "the greater the moving party's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor; conversely, the less likely it is that the moving party will succeed on the merits, the more the balance need weigh toward its side." *Duct–O–Wire*, 31 F.3d at 509. In addition, the court must take into account the public interest at risk if injunctive relief is granted or denied. *Id.*

## III. Discussion

### A. Some Likelihood of Success on the Merits

■ We first discuss whether Loewen has demonstrated some likelihood of success on its claim that Haberichter is breaching the covenant not to compete contained in his Employment Agreement.[6] Under Illinois law—which both parties agree provides the rules of decision in this diversity action— restrictive covenants are carefully scrutinized to ensure that they are connected to legitimate business interests, and not simply intended to stifle competition. *George S. May Int'l Co. v. International Profit Assocs.*, 256 Ill.App.3d 779, 195 Ill.Dec. 183, 189, 628 N.E.2d 647, 653 (Ill.App.Ct.1993), *appeal denied*, 156 Ill.2d 557, 202 Ill.Dec. 921, 638 N.E.2d 1115 (Ill.1994); *see Rao v. Rao*, 718 F.2d 219, 223 (7th Cir.1983). Thus, to be enforceable, a restrictive covenant must be ancillary to either a sales agreement or an employment agreement. *See Business Records Corp. v. Lueth*, 981 F.2d 957, 959 (7th Cir.1992); *Hamer Holding Group, Inc. v. Elmore (Hamer I)*, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 318, 560 N.E.2d 907, 915 (1990). This distinction is based on the different interests each type of covenant seeks to protect.

> Whereas a covenant ancillary to an employment contract shields the employer from the possibility of losing his clientele to an employee who appropriates proprietary customer information for his own benefit, and also shields him from the possibility of losing customers with whom he enjoys a near-permanent relationship; a covenant ancillary to the sale of a business ensures the buyer that the former owner will not walk away from the sale with the company's customers and goodwill, leaving the buyer with an acquisition that turns out to be only chimerical.

*Hamer I*, 148 Ill.Dec. at 319, 560 N.E.2d at 916; *see Lueth*, 981 F.2d at 959–60. The classification of a covenant into one of these two categories is critical, since a covenant ancillary to the sale of a business need only be reasonable in duration, geographical area, and scope to be enforceable. *Hamer I*, 148 Ill.Dec. at 318, 560 N.E.2d at 915. By contrast, a covenant ancillary to an employment agreement will be enforceable only if the employer demonstrates, in addition to the reasonableness of the restriction, certain special circumstances: (1) a "near-permanent" relationship between the employer and its customers, and that but for his association with the employer, the former employee would not have had contact with the customers; or (2) the acquisition and attempted use

---

**6.** As Loewen only seeks a preliminary injunction on this basis, we need not consider the merits of Counts I and III at this time.

of confidential information by the employee. *Audio Properties, Inc. v. Kovach,* 275 Ill. App.3d 145, 211 Ill.Dec. 651, 654, 655 N.E.2d 1034, 1037 (1995); *Hamer I,* 148 Ill.Dec. at 318–19, 560 N.E.2d at 915–16.

▆▆▆ Therefore, at the outset we must decide whether the covenant in this case was ancillary to the sale of D & S or ancillary to Haberichter's Employment Agreement. Resolution of this issue depends on the existence of " 'facts bearing on the intent of the parties to protect the integrity of the sale.' Such facts may include: whether the covenant was a condition precedent to the sale; whether the covenant was incorporated into the sale agreement; and the time that the parties signed the covenant in relation to the time they signed the sales agreement." *Lueth,* 981 F.2d at 960 (quoting and citing *Hamer I,* 148 Ill.Dec. at 319, 560 N.E.2d at 916, and *O'Sullivan v. Conrad,* 44 Ill.App.3d 752, 3 Ill.Dec. 383, 386, 358 N.E.2d 926, 929 (1976)). In this case it is clear that Haberichter's continued employment was not a condition precedent to the sale of D & S to Loewen. Although Loewen was obligated to *offer* Haberichter employment with the company, the Purchase Agreement explicitly relieved the company of this obligation if Haberichter did not wish to accept. Indeed, it appears from the correspondence between the attorneys for Loewen and Haberichter on February 12–13, 1992, that Haberichter unconditionally tendered his Employment Agreement only after the sale of D & S had closed. Nor was the covenant incorporated into the Purchase Agreement, as it was for the principals of D & S. Rather, the Purchase Agreement merely made Loewen's obligation to offer employment to Haberichter contingent upon his signing a covenant similar to the one executed by the owners of D & S. Finally, although the deal to purchase D & S was closed at about the same time Haberichter signed the Employment Agreement, the actual Purchase Agreement was signed and dated December 11, 1991—a full two months before the closing date on February 11, 1992. Based on these facts, we

cannot conclude that the Employment Agreement with Haberichter was signed in order to protect the integrity of the sale of D & S to Loewen. *Cf. Lueth,* 981 F.2d at 960 (finding covenant ancillary to sales agreement where noncompetition agreement was condition precedent to purchase, was incorporated into sales agreement, and was executed simultaneously with sales agreement); *Decker, Berta and Co., Ltd. v. Berta,* 225 Ill.App.3d 24, 167 Ill.Dec. 190, 191–194, 587 N.E.2d 72, 73–76 (Ill.App.Ct.) (upholding trial court's finding that covenant was ancillary to sale of business where purchaser required the two employees of the business to enter into employment agreements contemporaneous with the sale), *appeal denied,* 145 Ill.2d 632, 173 Ill.Dec. 3, 596 N.E.2d 627 (Ill.1992); *Hamer I,* 148 Ill.Dec. at 319–20, 560 N.E.2d at 916–17 (finding covenant ancillary to sales agreement where acquisition agreement explicitly required execution and delivery of employment agreement as condition precedent). Accordingly, we hold that the covenant not to compete was ancillary to Haberichter's Employment Agreement.

▆▆▆ We next turn to whether the covenant was enforceable. The reasonableness of a post-employment covenant not to compete is a question of law, *Lyle R. Jager Agency, Inc. v. Steward,* 253 Ill.App.3d 631, 192 Ill. Dec. 437, 440, 625 N.E.2d 397, 400 (Ill.App. Ct.1993), although the determination of whether a particular covenant is enforceable depends upon the unique circumstances of each case, *Hamer Holding Group, Inc. v. Elmore (Hamer II),* 244 Ill.App.3d 1069, 184 Ill.Dec. 598, 606, 613 N.E.2d 1190, 1198 (Ill. App.Ct.1993). Considering the evidence submitted at this point in the litigation, we are unable to determine if the covenant was reasonable as to its duration, geographical reach, and scope. Although three-year restrictive employment covenants have been upheld before, *e.g., Berta,* 167 Ill.Dec. at 195, 587 N.E.2d at 77, the parties dispute whether such a lengthy period of time was necessary in this case to protect Loewen.[7] Similarly,

---

7. Moreover, Loewen seeks to have a preliminary injunction run for three years from the date it is issued, rather than from the date of Haberichter's termination. We question whether Loew-

en is entitled to such an injunction, given that paragraph 19(a) the Employment Agreement appears to limit the duration of the covenant to three years from the date of termination. In any

the parties disagree about the reasonableness of the ten mile restriction on Haberichter's employment: Loewen argues that 75% of its business comes from a ten mile radius around its funeral homes, while Haberichter contends that the legitimate range of Oehler and L & O's business is much less. These disputes cannot be resolved without an evidentiary hearing, and thus we are not in an appropriate position to rule on the motion at this time.[8]

Likewise, there is disputed evidence as to the existence of a "near-permanent" relationship between Loewen and its customers. In evaluating a claim of near-permanency, courts are to consider the following objective factors:

> (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships.

*Kovach,* 211 Ill.Dec. at 654, 655 N.E.2d at 1037; *LSBZ, Inc. v. Brokis,* 237 Ill.App.3d 415, 177 Ill.Dec. 866, 874, 603 N.E.2d 1240, 1248 (1992). In this case, we cannot ascertain whether Loewen has a near-permanent relationship with its clients, since almost every one of the factors mentioned above is disputed by the parties. Loewen maintains that it takes years to develop the relationships in the community needed to obtain clients; Haberichter contends that the average period of time needed to develop a client and serve them is four days. There is no evidence of exactly how much money is spent to develop a client base. Loewen asserts that the development of long-term relationships with area churches and cemeteries is critical to the success of a funeral home; Haberichter maintains that price and location are the determinative factors of success. Although both parties apparently agree that funeral home employees have substantial contact with their customers, Haberichter contends that because of the nature of the business there are no repeat customers, and therefore an employee's contact with a customer is not significant.[9] Most of the evidence offered by the parties to support their positions is contained in affidavits from interested persons. As such, we believe that only after an evidentiary hearing can we make a finding as to the existence of a near-permanent relationship between Loewen and its customers. *See Abbott–Interfast Corp. v. Harkabus,* 250 Ill.App.3d 13, 189 Ill.Dec. 288, 294, 619 N.E.2d 1337, 1343 (1993) (reversing trial court's grant of judgment on the pleadings and remanding to take evidence on the enforceability of covenant).

Finally, we observe that in order to enforce the covenant, Loewen must also prove that but for his employment with the funeral home, Haberichter would not have developed contact with his current customers. *See Preferred Meal Sys., Inc. v. Guse,* 199 Ill.App.3d 710, 145 Ill.Dec. 736, 741, 557 N.E.2d 506, 511, *appeal denied,* 133 Ill.2d 572, 149 Ill.

---

event, such a period of time must be shown to be reasonable in order to be enforced.

**8.** Haberichter also argues that the scope of the covenant is unreasonable as well, since it might be construed to prohibit him from engaging in activities that do not directly compete with Loewen. However, no matter what interpretation is given to the covenant, it would clearly cover Haberichter's operation of a competing funeral home, and any overbreadth in the covenant can be remedied by limiting the scope of an injunction accordingly. *See Telxon Corp. v. Hoffman,* 720 F.Supp. 657, 666 (N.D.Ill.1989) ("Various Illinois courts have of course upheld the 'blue-penciling' of contracts by trial courts"); *McRand, Inc. v. Van Beelen,* 138 Ill.App.3d 1045,

93 Ill.Dec. 471, 480, 486 N.E.2d 1306, 1315 (1985).

**9.** To be sure, employers who provide professional services—such as lawyers and accountants—are more likely to have a near-permanent relationship with their clients, as opposed to employers who sell non-unique goods. *See Springfield Rare Coin Galleries, Inc. v. Mileham,* 250 Ill. App.3d 922, 189 Ill.Dec. 511, 512–13, 620 N.E.2d 479, 488–89 (1993). Nonetheless, simply because Loewen provides professional-like services does not necessarily demonstrate that it has a near-permanent relationship with its customers. *See Williams & Montgomery, Ltd. v. Stellato,* 195 Ill.App.3d 544, 142 Ill.Dec. 359, 366, 552 N.E.2d 1100, 1107 (1990) (holding that insurance defense law firm did not have near-permanent relationship with its clients).

Dec. 336, 561 N.E.2d 706 (1990). Loewen argues that all of Haberichter's contacts in the community were developed during his employment at D & S, and that any reputation or name recognition he may have came from his employment with D & S. Haberichter contends, however, that his reputation and involvement in the community did not come about because of his employment with *Loewen*, but because of his own efforts and his pre-Loewen employment with D & S. As with the issues discussed above, this question cannot be resolved without a more developed factual record and an evidentiary hearing.

Accordingly, we refer the motion for a preliminary injunction to Magistrate Judge Rosemond in order for him to conduct an evidentiary hearing and issue a report and recommendation on the issues discussed above.

### B. No Adequate Remedy at Law and Irreparable Injury

Loewen also maintains—as it must in order to obtain a preliminary injunction—that it has no adequate remedy at law and is suffering irreparable injury due to Haberichter's operation of the Meadows Funeral Home. Loewen argues that it has a protectable interest in its client base and goodwill, and that this interest is eroded each time a service is performed by Haberichter at his facility. However, our inability to reach a conclusion at this time about the existence of a near-permanent relationship precludes us from determining whether Loewen actually is suffering irreparable injury. Accordingly, we refer this portion of the motion to the magistrate judge as well, in order for him to take evidence and recommend a finding as to the type of injury suffered by Loewen and its ability to be compensated by money damages.

### C. Balance of Equities

Finally, we observe that although Loewen claims it will suffer severe, irreparable injury if Haberichter is allowed to continue the development of his business, there is very little evidence in the record to support this assertion. For example, while the plaintiff's ability to spread its goodwill and receive

referrals may be damaged by the defendant's actions, the extent of such damage is uncertain given that the Meadows Funeral Home encroaches on only 2.5 miles of restricted zone. Accordingly, we refer this issue to the magistrate judge to hear evidence and recommend a finding as to the balance of the equities.

### IV. Conclusion

For the reasons set forth above, the motion for a preliminary injunction is referred to Magistrate Judge Rosemond to conduct an evidentiary hearing as soon as practicable on the contested issues identified in this opinion. After conducting the hearing, the magistrate judge is directed to file report and recommendation with this court on the issue of whether a preliminary injunction should issue. It is so ordered.